**John KNOX, Jr. and Universal Surety of America, Appellants,**

v.

**Stacy TAYLOR and Standard Managing General Agency, Inc., Appellees.**

**No. 14–96–00993–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 11, 1999.

Rehearing Overruled April 8, 1999.

41

**45**

Cynthia L. Jones, Houston, John P. Cahill, Jr., Houston, for appellants.

David L. Monroe, Houston, Levert J. Able, Houston, H. Paul Pressler, Houston, for appellees.

Panel consists of Justices YATES, FOWLER, and DRAUGHN.*

## OPINION

YATES, Justice.

Appellants, John Knox, Jr. and Universal Surety of America, appeal from a judgment in favor of appellees, Stacy Taylor and Standard Managing General Agency, Inc., for libel and tortious interference with a contract. In this appeal, appellants challenge the sufficiency of the evidence, the failure of the trial court to submit their requested jury question, the admission of evidence and the calculation of prejudgment interest. We affirm.

## I. Background

Stacy Taylor is president and owner of Standard Managing General Agency (SMGA), which was formed in January 1993. On January 15, 1993, SMGA en-

tered into an agreement with Titan Indemnity Company (Titan), becoming managing general agent (MGA) for Titan. As MGA, SMGA would act as Titan's exclusive contract bond manager.[1] The agreement enabled SMGA to write bonds in all states in which Titan is authorized to do business.

Taylor is also president and owner of Standard Group, Inc. (SGI), which he formed in 1988. Taylor also formed Underwriters Risk Management (URM) in 1988, as a consulting firm. URM developed a computer system, called "Bond Ready," to manage surety contract business. In 1992, Mark Watson, CEO of Titan, expressed an interest in purchasing URM's computer system. Taylor, however, was not interested in selling. Titan then retained SGI to perform an audit of its nationwide surety business. According to Taylor, it was from this business relationship that Taylor entered into an MGA arrangement with Titan.

On November 30, 1993, Watson informed Taylor that he had received a package sent to him anonymously, containing a three-page memorandum and copies of two lawsuits filed against Taylor and his companies, SGI, URM, and Standard Fidelity Corp. After entering into the MGA contract with Titan in 1993, Taylor was sued by Eagle Insurance Company (Eagle) in two separate suits (the Kaiser lawsuit and the Formosa lawsuit). In the Kaiser and Formosa suits, Eagle alleged Taylor, as an agent for Eagle in 1990 and 1992, obtained consulting fees by fraud, representing that the consulting fees were bond premiums required by Eagle.[2] According

* Senior Justice Joe L. Draughn sitting by assignment.

1. Taylor explained a bond is issued by an insurance company to guarantee that a contractor, generally on a construction project, is going to perform the job for which it was hired. If the contractor does not perform under the contract, the insurance company steps in and takes care of those obligations. The insurance company charges a premium for the bond. The MGA is generally responsible for obtaining the bond from the insurance

company, delivering the bond to the contractor, and collecting the premiums. The MGA receives a commission out of the premiums and remits the difference to the insurance company.

2. The Formosa suit, filed July 16, 1993, alleged fraud and RICO violations (Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 et seq. (1984 & Supp.1998)) on the part of Taylor and his companies. The Kaiser suit, filed August 16, 1993, alleged fraud and misappropriation of trust funds

to Taylor, SGI purchased bonds from Eagle on behalf of U.S. Modular (Kaiser suit) and Gallagher Engineering (Formosa suit). URM provided consulting services to U.S. Modular and Gallagher. Taylor had signed agreements with U.S. Modular and Gallagher which provided that the fees to URM were not premiums and URM was not an insurance company.

Taylor notified Watson of the Eagle lawsuits immediately after they were filed. Taylor explained to Watson that the lawsuits were frivolous and the suits were a defensive tactic because Eagle was in financial trouble and was unable to pay its claims. According to, Taylor, Watson acted like the lawsuits were "not that big of a deal at the time."

As noted, Watson also received a three-page memorandum (the memo), which reads as follows:

[Page 1]

### A Case of a Managing General Agent ... Surety

In 1990 Keith Fogg convinced Ocean Marine that the surety business was the place to be. "A highly profitable line of business, where we can make a lot of money," Fogg said. Ocean Marine had excellent reinsurance and reinsurance relations. These relationships developed because of their expertise in the ocean marine business. With Fogg acting as the MGA for Ocean Marine they could not buy reinsurance for their surety business from any of the professional surety reinsurers ... that should have given them a strong signal that something was wrong.

Surely these professionals in the surety business understood that this was a very profitable line where they could make a lot of money. The MGA had no prior company experience. Basically, he was just an aggressive, hard driving agent

(TEX.PROP.CODE ANN. § 162.001 *et seq.* (Vernon 1995)). Taylor testified that both suits were

with good intention[s]. According to Keith, he and Dieter Hugel were "very close" and Keith would never intentionally do anything to hurt Hugel's company.

In 1991 the company had over $12 million in statutory surplus, a combined ratio under 100, and an A– AM Best rating. Two of its largest reinsurers, General Reinsurance Corporation and North American, have professional surety reinsurance departments. It is our understanding that the reinsurance never actually covered surety.

Surety production in 1990 was $975,000; in 1991 $2,173,000; in 1992 $5,038,00 [sic]. It does not take a lot of premium to go through a lot of surplus. In May of 1993 Keith Fogg stated "... The three largest losses totaled just over $20 million ... however if Ocean Marine wins one of the lawsuits the three may be down to around $15 million ... regardless they exceeded Ocean Marine's capital." There did not seem to be any reason to discuss the smaller losses.

Several companies have attempted to use general agents in the surety business. With few exceptions, companies that have appointed MGA's for surety have either become insolvent or discontinued writing surety (many times after AM Best has lowered or eliminated their rating).

[Page 2]

"We can write the accounts no one believes are writeable."

Stacy Taylor, Fall 1993

Mr. Taylor claims to be the exclusive managing general agent for Titan Indemnity. It has been rumored that he has both underwriting and claims authority. It will be interesting to see their 1994 surety results on March 1, 1995[.]

dismissed.

Stacy say's [sic], "If I charge enough, I can write anything."

| | |
|---|---|
| Joint Control Fees | 3% |
| Engineering Fees | 1% |
| Inspection Fees | 1% |
| Take Off Evaluation | 1% |
| Premium | 1-2% |
| Cost | 7-8% |

Note: The above "quotes" of Mr. Taylor are not direct quotes as the writer of this memorandum has only heard these second hand. When you hear something over and over, it tends to make one believe it may be true.

[Page 3]

## TEXAS ... A Surety Friendly State

| | | |
|---|---|---|
| Eagle Insurance Company | - | Receivership 1993 |
| Eastern Indemnity | - | Receivership |
| Allied Fidelity | - | Receivership |
| American Druggist | - | Receivership |
| Industrial Indemnity | - | Crum & Forrester with reinsurance and capital kept it solvent after the disasters. |

In Texas during the last 10 years the following companies have discontinued surety as a line of business.

1. Travelers
2. Trinity
3. Transamerica
4. Commercial Union
5. Commercial Credit
6. Armco (American Druggist)
7. Baldwin United
8. Eagle
9. Allied
10. Eastern

Per Taylor's request, Watson sent Taylor the memo, the lawsuits, and the envelope in which they were mailed. Taylor hired a private investigation firm to trace the package's sender through the postage meter stamp contained on the envelope.

Two days later, on December 2, 1993, Taylor received a fax from Thomas Mangold, executive vice president of Titan, informing him that Titan wanted to exit the surety business by December 31, 1993. Although Mangold cited several reasons for wanting to exit the contract surety business, no reference was made to the three-page memo or the Kaiser and Formosa suits.[3] Taylor claims that prior to

**3.** The December 2, 1993 letter stated:

Further to our recent discussions concerning the contract surety business, Titan has decided to leave this line of business. We have come to this conclusion for the following reasons:

1. Titan does not have the internal expertise, infrastructure or systems to adequately evaluate and respond to the needs of this class of business.
2. Contract surety does not represent a significant portion of our overall business.
3. The underwriting or production of contract business does not enhance or support either of our two core businesses (Public Entity and NonStandard Auto).
4. The distribution systems (agents) for Titan's core businesses are separate and distinct from those agents producing contract surety business. In other words, contract surety does not add value to our core insured or the agent customers.
5. We are unsatisfied with the expiring reinsurance program for contract surety business in terms of security, attachment point, limits and cost.
6. We are not confident that a short term reinsurance program can be arranged which adequately protects Titan.
7. We cannot, in good conscience, approach the reinsurance market place to arrange a long term reinsurance program knowing we intend to exit this class of business.
8. We have limited resources with respect to both capital and management and believe Titan's long term interest will be better served by deploying them toward activities which support and grow our core businesses.

Stacy, I am sure that if you put yourself in Titan's shoes you would come to the same conclusion we have concerning the contract surety business. We understand and respect your desires to grow into a full fledged surety insurance company and wish you the best with respect to your plans to form your own insurance company. We also understand your desire to have stable and long term relationships with the insurance companies you produce to. Unfortunately, for the aforementioned reasons, Titan cannot be that long term partner you are seeking.

December 2, 1993, Titan never discussed with him any of the stated reasons for canceling the contract.

On December 6, 1993, Taylor met with Watson to discuss Titan's desire to leave the contract surety business. Taylor claims Watson started off the meeting by stating the anonymous package had no bearing on the cancellation of the Titan/SMGA contract. Taylor also claims Watson, later in the meeting, admitted the package affected his decision to cancel the contract with SMGA.

The Titan/SMGA contract provided that it would continue in force until terminated by either party with 180 days (six months) notice prior to any anniversary date. The contract further allowed Titan to cancel the SMGA contract with thirty days notice on the basis that SMGA either failed to pay balances when due or for fraud by SMGA. Watson testified Titan did not follow the six-month notice clause. because Titan wanted out of the SMGA agreement.

> We have come to this with great consternation as we both respect and believe in you and your plans for contract surety business. From our perspective it would be best if we simply ceased writing contract surety business concurrent with the expiration of the extended reinsurance program at December 31, 1993. We are hopeful that you can place your ongoing surety risks with American Bonding and others until the formation of your own insurance company.
> After you have given some thought as to the best way to transition away from Titan, please give me a call to confirm how we will handle the run off.

4. Universal, an insurance company, competes with SMGA for agents for the placement of contract surety bonds. Universal does not use a managing general agent such as SMGA, but instead deals with clients directly. In 1985, Taylor obtained a bond from Knox's company, Universal. Taylor owned a company called Sunbelt Land and Maintenance. Sunbelt had been awarded a contract to sweep streets in Austin, using highway sweepers. Taylor approached Universal for a bond for more than $500,000. Universal approved the bond. Taylor later approached Universal for a second bond in the amount of $2,000,-000 for a project Sunbelt was awarded in Mesa, Arizona, for the maintenance of the city's parks and golf courses. Universal, how-

After this meeting, Taylor found out from the investigators that John Knox, president of Universal Surety of America (Universal), had sent the package to Watson.[4] Subsequently, Taylor learned Knox had also anonymously sent copies of the lawsuits, but not the memo, to Steve Smith, executive vice president of Munich American Reinsurance Company (Munich), and Dick Skewes, vice president of General Reinsurance Company (General). Munich and General are two of Titan's largest reinsurers. Smith and Skewes received the lawsuits on November 29, 1993. Bob Van Tassel of Munich called Mike Bodale at Titan and asked whether he knew of the lawsuits. Tom Carney of General contacted Watson about the lawsuits.

On December 7, 1993, Knox wrote to Watson asking if he had heard of the lawsuits, but not acknowledging that he had sent the memo and copies of the lawsuits.[5] Taylor next received a letter dated

ever, declined the second bond because Taylor had never delivered audited Sunbelt financial statements, which was a condition for issuing the first bond. At this point, Taylor decided to enter the contract surety business and formed the Standard Surety Company, later to become SGI.

5. The letter from Knox to Watson stated:
> Recently I have had several phone calls regarding Stacy Taylor. These calls have been prompted by two lawsuits that everyone in the surety industry seems to be talking about.
> As you are probably aware, these two suits involve Eagle Insurance Company. It is our understanding that Eagle filed these two suits as a defensive move. They apparently did not have the resources to pay their losses and therefore, as a delay tactic, filed suit against the owner and the agent. Most of the allegations seem outrageous and extremely difficult to prove.
> I'm not sure why, however, several people have asked if we did or would send you a copy of the suits. I assume that you have seen these suits. If not, I would be glad to send you a copy.
> Though I have never met Gene Holt or Lindey Jennings, I understand that they are doing a very good job of building a good book of surety business. Our San Antonio

December 10, 1993, from J. Martin Huber, executive vice president of the National Association of Surety Bond Producers (NASBP), informing Taylor that an executive meeting was scheduled for February 12, 1994. The purpose of the meeting was to discuss the Kaiser and Formosa lawsuits. Huber indicated that Taylor could submit any information he wanted regarding the lawsuits to the committee prior to the meeting.

Prior to its December 2, 1993 notice of cancellation, Titan had provisionally canceled its contract with SMGA. On July 15, 1993, Titan sent a provisional notice of cancellation to Taylor. On August 19, 1993, however, Titan rescinded the notice and stated it was "pleased" to continue doing business with SMGA for another year.

In October 1993, Titan notified Taylor that it wanted to modify the underwriting requirements. Titan proposed that in exchange for Titan allowing Taylor to use Titan on a "front funding" basis, Taylor would provide a $500,000 letter-of-credit, which would limit Titan's exposure to risk of loss. Taylor testified this proposal was related to Titan's expressed interest in purchasing Taylor's companies.

On June 3, 1994, in accordance with the MGA agreement, Titan sent written notice of cancellation to Taylor, effective the next anniversary date, July 15, 1995.[6] Taylor talked to Titan about rescinding the cancellation, but Titan refused to do so. Taylor was able to sign an MGA agreement with Ranger Insurance Company on October 1, 1994.

On December 27, 1993, Taylor filed suit against Knox and Universal, alleging claims for defamation and tortious interference with the Titan contract. The case proceeded to trial before a jury on March 18, 1996. With regard to the tortious interference claim, the jury found (1) appellants had intentionally interfered with the Titan/SMGA contract; (2) the interference was not justified; and (3) the interference was done with actual malice. With regard to the libel claim, the jury found (1) appellants had made libelous statements; (2) the libelous statements were not substantially true; and (3) the libelous statements were made with knowledge of or with reckless disregard for their falsity. Based on these findings, the jury awarded $750,000 in damages for injury to Taylor's reputation, $100,000 for mental anguish, and $2,700,000 for lost profits incurred by SMGA. The jury awarded Taylor $100,000 in punitive damages based on the finding of malice. On April 18, 1996, the trial court entered final judgment in favor of appellees. Appellants bring thirty-two points of error.

## II. Standards of Review

### A. Legal Sufficiency

When reviewing a challenge to the legal sufficiency of evidence, *i.e.*, a "no evidence" point of error, the reviewing court may consider only the evidence and inferences that support the challenged findings and should disregard all evidence and inferences to the contrary. *See ACS Inv., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges merely go to the weight of the evidence. *See Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993). The court may sustain a "no

office reports that they are very strong underwriters who are doing a very good job. The next time you visit Houston please call if you get a chance. I would certainly like to meet you.

6. In June 1994, Titan was going to cancel the SMGA contract with thirty days notice on the ground that SMGA was behind in its premium payments to Titan. Titan called SMGA to confirm the status of the payments and learned SMGA was not behind in its payments. Titan, therefore, could not cancel on that basis.

evidence" point of error if the record reveals one of the following:

(1) a complete absence of evidence of a vital fact;

(2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact;

(3) the evidence offered to prove a vital fact is no more than a scintilla; and

(4) the evidence established conclusively the opposite of the vital fact.

*See Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). There is some evidence when the proof supplies a reasonable basis upon which reasonable minds could reach different conclusions about the existence of a vital fact. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

## B. Factual Sufficiency

In reviewing a challenge that the jury's finding is against the great weight and preponderance of the evidence, we must examine the entire record to determine if there is some evidence to support the finding. *See Oadra v. Stegall,* 871 S.W.2d 882, 892 (Tex.App.—Houston [14th Dist.] 1994, no writ). After considering and weighing all the evidence, we shall set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Peter v. Ogden Ground Servs., Inc.,* 915 S.W.2d 648, 649 (Tex.App.—Houston [14th Dist.] 1996, no writ). The jury as trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 213 (Tex.App.—Houston [14th Dist.] 1991, no writ). Because the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact,

even if a different answer could be reached on the evidence. *See Peter,* 915 S.W.2d at 649; *Times Herald Printing Co.,* 820 S.W.2d at 213. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *See Peter,* 915 S.W.2d at 650.

## III. Libel

### A. Memorandum

■■■ In points of error eleven, thirteen, and fourteen, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's finding that the memo constituted libel. Under Texas law, libel is a written or printed defamation which tends to injure the reputation of a living person and thus, expose him to public hatred, contempt, ridicule, or financial injury. *See Hill v. Herald–Post Publ'g Co.,* 877 S.W.2d 774, 778 (Tex. App.—El Paso), *aff'd in part and rev'd in part on other grounds,* 891 S.W.2d 638 (Tex.1994); *Sellards v. Express–News Corp.,* 702 S.W.2d 677, 679 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). In determining whether a statement is libelous, "we must look at it from the point of view it would have on the mind of the ordinary reader." *Sellards,* 702 S.W.2d at 679. We must further construe the statement as a whole in light of all the surrounding circumstances. *See id.*

■■■ Libel *per se* means the written or printed words are so obviously hurtful to the person aggrieved that they require no proof of their injurious character to make them actionable. *See Hammond v. Katy Indep. Sch. Dist.,* 821 S.W.2d 174, 179 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Bradbury v. Scott,* 788 S.W.2d 31, 38 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Defamation is actionable *per se* if it injures a person in his office, business, profession, or occupation. *See Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 922 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.); *Bradbury,* 788 S.W.2d at 38.

■ Appellants contend the three-page memo is not capable of defamatory meaning. They claim the alleged libelous statements in the first and third pages of the memo do not harm Taylor with respect to his business because his business is never mentioned. Our reading of the memo reflects otherwise. The memo alleges Keith Fogg, an MGA with no prior experience, caused Ocean Marine, an insurance company, to incur "over $20 million" in losses. Immediately following the detailed description of what happened to Ocean Marine, purportedly because of Fogg, is a reference to Taylor's relationship with Titan as an MGA. The analogies between Ocean Marine and Titan, and Fogg and Taylor are obvious. In reading the memo as a whole, it is easy to draw the inference that Titan will also suffer substantial financial losses due to Taylor managing its contract surety business. Furthermore, it is irrelevant that Knox did not mention "SMGA" in the memo because Taylor, who is the sole owner of SMGA, is mentioned in the memo several times.

Appellants further contend the statements on the second page, which are attributable to Taylor, merely suggest he is a very aggressive businessman. *See Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653 (Tex.1987). In *Musser,* the Texas Supreme Court held that a letter written by the plaintiff's former employer to a former client was not libelous. *See id.* at 655. The plaintiff, Musser, left his employer, Smith Protective Services (Smith), a security services firm, to form his own investigative firm. *See id.* at 654. A former client of Smith's was under contract to Musser's company for polygraph testing of current and prospective employees. *See id.* In a letter to the client, Smith stated, " '[w]hen Mr. Musser left us, he was able, as so many of our ex-employees have in the past, to relieve us of certain of our polygraph accounts.' " *Id.* The court determined that the statement was not libelous, but instead merely referred to Musser as a "successful competitor." *Id.* at 655.

Contrary to appellants' assertions, we find that the memo accuses Taylor of bad business practices, rather than merely being an "aggressive businessman." With regard to the quotes, "We can write the accounts no one believes are writeable," and "If I charge enough, I can write anything," Taylor testified only a "reckless" or "foolish" person would make such statements. Furthermore, appellants' expert witness, Ed Frank, president of Underwriters Indemnity Company, testified he would be concerned if any of his underwriters were to make such statements.

We find the evidence is both legally and factually sufficient to support the jury's finding that appellants made libelous statements. Moreover, because the memo is injurious to Taylor's business and profession, it is actionable *per se.* Appellants' eleventh, thirteenth, and fourteenth points of error are overruled.

### B. Lawsuits

■ In their sixteenth point of error, appellants claim the trial court erred in rendering judgment in favor of appellees on their defamation claim because the publication of lawsuits is absolutely privileged. "An absolutely privileged communication is one for which, by reason of the occasion upon which it was made, no remedy exists in a civil action for damages for libel or slander even though the language was false and was uttered or published with express malice." *Zarate v. Cortinas,* 553 S.W.2d 652, 654 (Tex.Civ.App.—Corpus Christi 1977, no writ); *see also Frank B. Hall & Co. v. Buck,* 678 S.W.2d 612, 622 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). It is well-settled law in Texas that any written or oral communication made in the due course of a judicial proceeding is absolutely privileged. *See James v. Brown,* 637 S.W.2d 914, 916 (Tex. 1982); *Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909, 912 (1942); *Village of Bayou Vista v. Glaskox,* 899 S.W.2d 826, 829–30 (Tex.App.—Houston [14th Dist.] 1995, no writ). The privilege,

attaching to all aspects of the proceedings, extends to statements made by the judge, jurors, counsel, parties, and witnesses. *See James*, 637 S.W.2d at 916; *Village of Bayou Vista*, 899 S.W.2d at 830. Thus, communications made in the due course of a judicial proceeding cannot serve as the basis of an action for defamation, regardless of the negligence or malice with which they were made. *See James*, 637 S.W.2d at 916.

■ Appellees argue that the judicial privilege does not apply to facts such as these where a non-party to a lawsuit sends copies of the pleadings to others who also are not parties to that suit. Appellees, however, rely upon a case finding waiver of the absolute privilege. *See Levingston Shipbuilding Co. v. Inland West Corp.*, 688 S.W.2d 192 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). In *Levingston*, Inland West was an engineering firm which had done work for Levingston. *See id.* at 196. Inland West planned to start another shipyard in Orange County, Texas, which would be in competition with Levingston. *See id.* Levingston filed a lawsuit against Inland West alleging that Inland had disclosed trade secrets. *See id.* Immediately after filing the lawsuit, the owner of Levingston instructed an employee and one of the attorneys to give a copy of the lawsuit to the media, which resulted in extensive publication and subsequent harm to Inland West's reputation for confidentiality of its work. *See id.* Prior to the filing of the lawsuit, Inland West had secured approval from the Orange County Commissioners' Court for a $10,000,000 bond issue. *See id.* The bond issue, however, was never finalized after Levingston filed the lawsuit. *See id.* Inland West counter-sued for defamation. *See id.*

The court of appeals noted that Levingston's petition, when filed in the District Court of Orange County, was privileged and the privilege extended to the press if the petition was obtained from court records. *See id.* The court further addressed the extent to which the privilege was applicable. The court observed that the jury believed that Levingston, "using the method of filing the lawsuit, intended to eliminate any competition from Inland, and that, in doing so, [it] accomplished [that] purpose." *Id.* Therefore, the court held "that by [Levingston]'s actions [it] stepped out of the umbrella of privilege." *Id.* at 196–97. In reaching its decision, the Beaumont Court of Appeals relied on *De Mankowski v. Ship Channel Dev. Co.*, wherein the Galveston Civil Court of Appeals stated:

> "The privilege accorded a litigant which exempts him from liability for damages caused by false charges made in his pleadings, or in the court in the course of a judicial proceeding, cannot be enlarged into a license to go about in the community and make false and slanderous charges against his court adversary and escape liability for damages caused by such charges on the ground that he had made similar charges in his court pleadings."

*Id.* at 196 (quoting 300 S.W. 118, 122 (Tex. Civ.App.—Galveston 1927, no writ)).

Although not cited by either appellants or appellees, our research reveals a case from the El Paso Court of Appeals, which expressly disagrees with the decision in *Levingston*. *See Hill*, 877 S.W.2d at 783. In *Hill*, the court opined that *Levingston's* reliance on *De Mankowski* was misplaced. *See id.* The El Paso court stated that in *De Mankowski* the defamation suit was based not upon the appellant's pleadings in the prior suit, but rather upon the appellant's slanderous statements made to other persons prior to and subsequent to the filing of the lawsuit. *See id.*

The court in *Hill* stated with respect to the decision in *Levingston:* "Although [the *Levingston*] facts seem to justify the affirmance of the jury verdict, the holding has no support in the case law and is a deviation from the general rule of absolute privilege." *Id.* The court reasoned:

The harm resulting to the defamed party by delivering a copy of the suit or motion in a *pending* proceeding to the news media could demonstratively be no greater than it would be if the news media reporters got a tip from someone or found the pleadings on their own. *Id.*

Whether sending copies of pleadings by a person who is not a party to that litigation to other non-parties constitutes defamation, or whether such action if defamation is entitled to the judicial privilege, is a question of first impression. We find, however, the judicial privilege inapplicable because Knox was not a party to either the Kaiser or Formosa litigation, and further because Eagle is not a party to the case at bar. Texas law is clear—the privilege applies to statements made by the judge, jurors, counsel, parties, and witnesses in the due course of judicial proceedings. *See James,* 637 S.W.2d at 916; *Village of Bayou Vista,* 899 S.W.2d at 830. Although we do not recognize a judicial privilege on the facts of this case, we find the reasoning in *Hill* instructive. The pleadings, once filed, were a part of the public record. Any of Taylor's competitors or business associates could have obtained the pleadings on their own.[7] Indeed, Watson knew of the litigation prior to Knox's mailing the petitions because Taylor had informed him of the lawsuits immediately after their filing.

Thus, we agree with appellants that the publication of the lawsuits *alone* could not form the basis for a defamation claim.

However, unlike the parties in *Levingston* and *Hill,* Knox did more than merely send a copy of the pleadings in the Kaiser and Formosa litigation. He sent a *package* of materials, which included a three-page memo containing false information that we have determined was libelous. Thus, considering the statement (*i.e.,* "package") as a whole, we find that it was libelous. Accordingly, we overrule point of error sixteen.

Appellants, in their twelfth point of error, contend that because the mailing of the lawsuits was absolutely privileged, the trial court should have submitted a question asking only if the memo was defamatory. The court's charge asked generally whether appellants had made any defamatory statements about Taylor, without regard to any distinction between the publication of the lawsuits and the memo. A review of the clerk's record establishes that appellants submitted two proposed questions—one regarding whether the lawsuits constituted libel and the other whether the memo constituted libel. In light of our conclusion that the entire package, containing the three-page memo and the Formosa and Kaiser lawsuits, was defamatory, we further find the trial court did not err in not charging the jury with separate issues on the lawsuits and the memo. Appellants' twelfth point of error is overruled.

## C. Truth of the Statements

In point of error ten, appellants claim the jury's finding that the al-

7. The Texas Supreme Court addressed the issue of the publication of pleadings in the context of an invasion of privacy claim, but not in the context of the "judicial privilege" defense of a defamation claim. *See Industrial Found. of the S. v. Texas Indus. Acc. Bd.,* 540 S.W.2d 668 (Tex.1976). The specific issue in *Industrial Found. of the S.* was whether the Texas Open Records Act compelled the Texas Industrial Accident Board to disclose information regarding claims for workers' compensation benefits to the Industrial Foundation of the South. *See id.* at 672. The court stated "[o]nce information is made a matter of public record, the protection accorded freedom of speech and press by the First Amend-

ment may prohibit recovery for injuries caused by any further disclosure of and publicity given to such information, at least if the information is newsworthy." *Id.* at 684 (Tex. 1976) (citing *Cox Broad. Co. v. Cohn,* 420 U.S. 469, 495–96, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975)); *see also Hogan v. Hearst Corp.,* 945 S.W.2d 246, 250 (Tex.App.—San Antonio 1997, no writ); *Gill v. Snow,* 644 S.W.2d 222, 224 (Tex.App.—Fort Worth 1982, no writ). The court further explained "the State may not protect an individual's privacy interests by recognizing a cause of action in tort for giving publicity to highly private facts, if those facts are a matter of public record." *Industrial Found. of the S.,* 540 S.W.2d at 684.

leged defamatory statements were not substantially true is against the great weight and preponderance of the evidence. Truth, which is an affirmative defense, is a complete defense to defamation. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995); *Gulf Constr. Co. v. Mott*, 442 S.W.2d 778, 784 (Tex.Civ. App.—Houston [14th Dist.] 1969, no writ). Because truth is an affirmative defense, the defendant bears the burden of establishing that the alleged defamatory statements were true. *See Tatum v. Liner*, 749 S.W.2d 251, 256 (Tex.App.—San Antonio 1988, no writ); *Frank B. Hall & Co.*, 678 S.W.2d at 623–25.

The statements need not be literally true; rather, the "substantial truth" is sufficient. *See Stephens v. Delhi Gas Pipeline Corp.*, 924 S.W.2d 765, 769 (Tex.App.—Texarkana 1996, writ denied); *Gulf Constr. Co.*, 442 S.W.2d at 784. The test for determining whether a publication is substantially true is whether the alleged defamatory statement was more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been. *See Granada Biosciences, Inc. v. Barrett*, 958 S.W.2d 215, 223 (Tex.App.—Amarillo 1997, pet. filed); *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex.App.—Houston [14th Dist.] 1997, no writ).

Knox, the author of the memo, claims every statement in the memo was substantially true. Knox states his sources for the first and third pages of the memo were Keith Fogg, the MGA to whom the memo refers, and various industry publications. Appellees, on the other hand, assert that the statements on the first page were false. Dick Skewes of General testified that although the memo states General was a reinsurer for Ocean Marine, General was, in fact, not one of Ocean Marine's listed reinsurers. Skewes further stated he does not know anything about Keith Fogg or Ocean Marine.

With respect to the statements on the second page of the memo, "We can write the account no one believes are writeable," and "If I charge enough, I can write anything," appellants contend these were not direct quotes from Taylor, but instead were paraphrases of statements Knox claims he heard Taylor had made. Appellants claim Taylor's testimony supports the truth of these statements because Taylor testified that he entered the surety business because he had had difficulty getting bonded and he believed there was a need for someone to facilitate the bonding process for other contractors who had problems obtaining bonds. Appellants also assert the substantial truth of the quotes was further confirmed by John Harrington, executive vice president of URM. Harrington testified that SMGA had been successful in writing bonds for companies that other agents had not been able to write.

Appellees charge that despite the disclaimer, the memo attributes the quotes to Taylor. At trial, Taylor denied making the statements. Knox testified he had heard the statements from his underwriters. Knox, however, was only able to name one person from whom he purportedly heard these statements—Jack McReynolds, vice president of Universal. Contrary to Knox's assertion, McReynolds testified he never heard anyone say Taylor had made those statements. Furthermore, McReynolds testified he did not state to anyone that Taylor had made those statements.

The second page of the memo lists a number of fees, including joint control fees, engineering fees, inspection fees, and take-off evaluation fees, suggesting that Taylor charges these fees to his customers in addition to premiums. Regarding the specific fees listed, Knox testified that although he created the categories of fees to arrive at the eight percent figure he saw in the lawsuit, the total fee charged by Taylor was, in fact, truthful. Appellants contend that how the fees were broken down would make no difference in the mind of the

average reader because the total fee was exorbitant.

Taylor testified he never charged the fees asserted in the memo. Moreover, appellees point out that Knox testified he had never heard of inspection, engineering, or take-off evaluation fees. Furthermore, Knox stated he did not know if Taylor charged such fees. The jury's finding that the defamatory statements are not substantially true is not against the great weight and preponderance of the evidence.[8] Appellants' tenth point of error is overruled.

### D. Malice

In points of error seventeen and eighteen, appellants claim there was legally and factually insufficient evidence that any alleged defamatory statements were made with malice. In point of error nineteen, appellants maintain the jury's finding of punitive damages is against the great weight and preponderance of the evidence.

Actual malice, in the context of a defamation claim, is a term of art which is separate and distinct from common law malice. *See Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989). It does not include ill-will, spite, or evil motive, but rather requires " 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " *Id.* (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). In other words, a defamatory statement is made with actual malice when it is made with knowledge of its falsity or with reckless disregard as to its truth. *See Randall's Food Mkts., Inc.,* 891 S.W.2d at 646; *Hagler v. Proctor & Gamble Mfg. Co.,* 884 S.W.2d 771 (Tex.1994) (per curiam).

It is not sufficient for the jury to disbelieve the defendant's testimony, but instead, the plaintiff must present clear and convincing evidence to support recovery. *See Casso,* 776 S.W.2d at 558. Whether the defendant had serious doubts regarding the truth of the defamatory statement may be proved by circumstantial evidence. *See Frank B. Hall & Co.,* 678 S.W.2d at 621; *Gulf Constr. Co.,* 442 S.W.2d at 784. Thus, it is not necessary for the plaintiff to "secure an admission from the defendant that he published the statement knowing of its falsity or with serious doubt as to its truth." *Frank B. Hall & Co.,* 678 S.W.2d at 621. The defendant can establish the absence of malice by showing the speaker never entertained any serious doubts regarding the truth of the statements. *See Hanssen v. Our Redeemer Lutheran Church,* 938 S.W.2d 85, 93 (Tex.App.—Dallas 1996, writ denied).

A conditional or qualified privilege applies to the giving of information to persons interested in the trade and commercial standing of another at the time the information is given, but does not apply to the furnishing of such information to others not so interested. *See Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 898–99 (Tex.1970); *see also Pioneer Concrete of Tex., Inc. v. Allen,* 858 S.W.2d 47, 49 (Tex.App.—Houston [14th Dist.] 1993, writ denied). The privilege is an affirmative defense in the nature of a confession and avoidance. *See Denton Publ'g Co. v. Boyd,* 460 S.W.2d 881, 884 (Tex.1970). The defendant has the burden of proving the communication was privileged. *See id.* Whether a privilege exists is a question of law. *See Galveston County Fair & Rodeo, Inc. v. Glover,* 880 S.W.2d 112, 120 (Tex. App.—Texarkana 1994), *writ denied,* 940 S.W.2d 585 (Tex.1996) (per curiam); *Houston v. Grocers Supply, Inc.,* 625 S.W.2d 798, 800 (Tex.App.—Houston [14th Dist.] 1981, no writ). Once the defendant establishes the communication is privileged, the plaintiff must then show the privilege is

---

8. Because we have determined that the mailing of the lawsuits with the three-page memo constituted libel, we need not address the truth of the allegations contained in the petitions.

lost. *See Denton Publ'g Co.*, 460 S.W.2d at 884. A qualified privilege is lost if the communication is motivated by malice. *See Pioneer Concrete of Tex., Inc.*, 858 S.W.2d at 49.

 Appellants assert a qualified privilege exists because Knox shared a common interest with Watson—they are competitors in the contract surety business. In support of this assertion that a qualified privileged exists, but is not waived by malice, appellants rely on *Holloway v. Texas Med. Ass'n*, 757 S.W.2d 810 (Tex.App.—Houston [1st Dist.] 1988, writ denied). Attorney John Holloway sued Dr. Donald Butler and the Texas Medical Association (TMA) for libel and slander. *See id.* at 811. Holloway had sued Butler and another doctor for malpractice on behalf of his client, Mary Morgan. *See id.* The case went to trial and Butler and the other doctor were found not libelous. *See id.* Butler then initiated proceedings against Holloway before the State Bar Grievance Committee, charging him with "barratrous conduct in fomenting and instigating litiga-

tion without merit." *Id.* The Grievance Committee found the charges were without basis. *See id.* Butler filed suit against Holloway and Morgan for malicious prosecution. *See id.* Morgan was nonsuited and the suit against Holloway was eventually dismissed for failure to state a cause of action. *See id.* The First Court of Appeals affirmed the judgment of the trial court. *See id.*

Butler filed an application for writ of error with the Texas Supreme Court. *See id.* The Houston Surgical Society and the TMA offered Butler support for his appeal. *See id.* The TMA contributed $1,500. *See id.* Dr. Fred Castrow, a colleague of Butler's whom Holloway had previously sued, drafted a letter seeking contributions for Butler's appeal. *See id.* at 811–12. Thomas Beech, Butler's attorney, drafted a memorandum which Castrow attached to the letter.[9] *See id.* at 812. The letter, which was written on Castrow's professional letterhead and signed by Castrow, was mailed to 200 physicians.[10] *See id.*

9. The memo stated:

 FIGHTING BACK—A LONG LEGAL STRUGGLE

 In February, 1971, Dr. Donald Butler, operated on Mary Morgan. Dr. Butler, along with Dr. Abel Leader and Center Pavilion Hospital, were all sued for malpractice in January, 1973. The case was on the docket of the Court for three (3) years, in which time the Plaintiff's Attorney did not use any of the various discovery methods available to him and did not take any depositions of the two doctors or Hospital or question them by written interrogatories concerning the facts of the alleged malpractice case.

 During the jury trial that resulted, Plaintiff's counsel failed to produce any medical expert testimony. After three-day trial in February, 1976, a jury verdict was rendered in favor of the doctors and the Hospital. Dr. Butler then retained Thomas R. Beech, a Houston lawyer, who prepared and filed a countersuit on July 20, 1976 against the patient, Mary Morgan, and her Attorney, John Holloway. In the insuing two and one-half (2½) years, numerous discovery methods were utilized, including an audio-visual deposition of Attorney Holloway and the depositions of all parties. De-

 fendant Holloway made three Motions for Summary Judgment which were all denied and the case was assigned to trial in January, 1979.

 However, on the date that the case was to go to jury trial, it was assigned to a visiting Judge from Brazoria County, Judge Olin Wellborn, who granted Defendant Holloway's last minute motions and dismissed the case.

 Mr. Thomas Beech, Dr. Butler's counsel, then took his appeal to the First Court of Civil Appeals in Houston and had oral argument on September 6, 1979. The Court of Appeals affirmed the Trial Court's opinion on September 20, 1979. Dr. Butler's appeal to the Supreme Court of Texas is presently being prepared by W. Page Keeton and Mr. Beech.

10. The letter stated:

 Your help is needed urgently for a cause that is of vital concern to you. Dr. Donald B. Butler is presently engaged in a fight to try to establish a precedent for countersuits against lawyers who have sued physicians in Texas without cause. See the enclosed summary of the case as presented by Dr. Butler's lawyer, Mr. Thomas R. Beech.

Butler's application for writ of error was refused by the Texas Supreme Court. *See id.* at 813. Holloway then filed suit against Butler, Beech, and the TMA for libel and slander. *See id.* At trial, the jury found the letter and memo were defamatory. *See id.* On appeal, the First Court of Appeals determined that the publication of Castrow's letter and Beech's memo were protected by a conditional privilege. *See id.* The court found the letter's stated purpose was to solicit funds to establish a court precedent. *See id.* at 814. Moreover, Holloway did not (1) offer any contradictory testimony regarding the reason for the publication of the letter, (2) prove an unlawful manner or purpose, or (3) dispute the common interest of the recipients. *See id.*

We find that the similarities between the facts of this case and those in *Holloway* are limited. Unlike in *Holloway*, Knox sent the memo anonymously. Moreover, Knox wrote Watson a week after mailing the package, in what appears to be an effort to deny having sent the anonymous memo by stating, "I'm not sure why, however, several people have asked if we did or would send you a copy of the suits." Additionally, the memo authored by Knox, unlike the documents in *Holloway*, did not state that it was in support of any legitimate purpose. We do not find that the memo in this case falls within the qualified privilege defense.

In view of the "damaging nature of the statements to [Taylor's] professional reputation, the context in which they were made, [Knox's] lack of personal verification, and the statements falsity," we conclude the evidence in support of the jury's finding of malice is both legally and factu-

ally sufficient. *See Shearson Lehman Hutton, Inc.,* 806 S.W.2d at 924.[11] Therefore, the jury's finding of punitive damages is not against the great weight and preponderance of the evidence. Appellants' seventeenth, eighteenth, and nineteenth points of error are overruled.

## IV. Tortious Interference

### A. Memorandum

In their twentieth and twenty-first points of error, appellants claim there is legally and factually insufficient evidence to support the jury's finding that Knox intentionally interfered with the Titan/SMGA contract. The elements of tortious interference are (1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *See Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996); *Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex.1995). Generally, merely inducing a contract obligor to do what it has a right to do is not actionable interference. *See ACS Investors, Inc.,* 943 S.W.2d at 430.

Appellants claim the distribution of the memo did not cause the relationship between Titan and appellees to end because the Titan/SMGA contract provided either party could terminate the contract with written notice. The Titan/SMGA contract was terminable-at-will by either party. Until terminated, third persons are not free to tortiously interfere with contracts which are terminable-at-will. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989) (citing RESTATEMENT

Dean W. Page Keeton has agreed to assist in the presentation of the appeal of this case to the Supreme Court of Texas. The fee for this service is approximately fifteen thousand dollars. I do not feel that Dr. Butler should carry the entire financial burden for this battle which is of importance to each of us. The Texas Medical Association has agreed to assist with a check for fifteen thousand dollars, but we need to carry a larger share of this fee.

11. As previously noted, we need not address Knox's belief regarding the truth of the allegations contained in the lawsuits because of our prior determination that the package, containing the three-page memo and lawsuits, is defamatory.

**58**

(SECOND) OF TORTS § 766, cmt. g (1979)). Therefore, it is no defense to an action for tortious interference that a contract is terminable at will. *See Juliette Fowler Homes, Inc.*, 793 S.W.2d at 666 (citing *Sterner*, 767 S.W.2d at 689).

▪ Appellants also contend the testimony of Watson establishes Titan would have exited the contract surety business regardless of Knox's actions. Watson testified that in October 1993, he was concerned that Titan would not be able to make any money from the contract surety business. Moreover, Watson stated the memo had no effect on his relationship with or opinions of Taylor.

Taylor testified that he told Watson he would form an MGA only if Titan agreed to a ten to fifteen year arrangement. According to Taylor, Watson was in agreement on a long-term relationship, and it was based on this understanding that Taylor entered into an MGA agreement with Titan. The testimony of Watson and Mangold appear to confirm Taylor's belief that Titan entered into the MGA relationship with SMGA for the long term. Watson testified, "I don't think we anticipated entering into an agreement with anybody, Stacy included, if, you know, it was for a short term." Mangold testified that in his discussions with Taylor, they had hoped for a long-term relation between SMGA and Titan.

Moreover, Watson stated he did not have any problems with Taylor's operation in 1993. In fact, Watson believed Taylor had helped Titan in controlling its losses from business written before contracting with SMGA and that the SMGA bonding program was profitable at the time Titan sent notice of cancellation in December 1993. Finally, with respect to whether receiving the anonymous package "accelerated" Titan's decision to exit the contract surety business, Watson responded, "Oh, I'd say that it was a, you know, sort of the icing on the cake."

Appellants assert that prior to November 1993, Titan had twice notified Taylor of its desire to end its contractual relationship with SMGA. The first notice was in July 1993, when Titan sent Taylor a provisional notice of cancellation of the contract. Taylor testified that he talked to Titan about the notice and asked that it be withdrawn. On August 19, 1993, Titan agreed to withdraw the notice and stated it was "pleased" to continue working with Taylor for another year.

The second notice, according to appellants, was on October 12, 1993, when Titan wrote Taylor seeking a different bond writing arrangement, which included "front funding" by Titan in exchange for a letter of credit provided by SMGA to decrease Titan's risk of loss. Taylor testified that at this time, there had not been any discussions regarding Titan's desire to end its relationship with SMGA. Instead, according to Taylor, the October 12 proposal and the discussions surrounding the proposal related to Titan's offer to purchase Taylor's companies. Titan offered Taylor a position on its board of directors in exchange for selling his companies. After a meeting with Titan in San Antonio regarding the October 12 proposal, Taylor wrote Titan stating, "Each time we meet I feel better that our business relationship will be long term and profitable for both our companies."

We the find the evidence is both legally and factually sufficient to support the jury's finding that Knox's sending the memo interfered with Taylor's business relationship with Titan. Appellants' twentieth and twenty-first points of error are overruled.

### B. Lawsuits

▪ In their fifteenth point of error, appellants claim the trial court erred in rendering judgment in favor of appellees on their tortious interference claim because the publication of lawsuits is absolutely privileged. While the publication of the lawsuits alone cannot form the ba-

sis for a defamation claim, we have determined the publication of the entire package was libelous. Similarly, the publication of the lawsuits with the memo constitutes tortious interference with a contract. Appellant's fifteenth point of error is overruled.

### C. Justification

 Appellants assert in their twenty-second and twenty-third points of error that Knox was justified in his actions and the jury's finding that he was not justified is against the great weight and preponderance of the evidence. Even if the plaintiff establishes all the elements of his claim for tortious interference, the defendant may avoid liability if he establishes the elements of the affirmative defense of justification. *See Texas Beef Cattle Co.,* 921 S.W.2d at 210. Justification is an affirmative defense because the defendant does not deny the interference, but instead seeks to avoid liability. *See Edwards Transp., Inc. v. Circle S Transp., Inc.,* 856 S.W.2d 783, 786 (Tex.App.—Amarillo 1993, no writ). A party is privileged to interfere with the contractual relations of another if (1) it is done in the bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the party to the contract. *See Murray v. Crest Constr., Inc.,* 900 S.W.2d 342, 344 (Tex.1995). Because it is an affirmative defense, the party asserting the defense bears the burden of proof. *See Sterner,* 767 S.W.2d at 690. Justification protects only good faith assertions of legal rights. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). Legal malice, which is defined as an unlawful act, done intentionally, without just cause or excuse, negates the justification defense. *See Texas Beef Cattle Co.,* 921 S.W.2d at 210; *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied).

 Appellants argue the evidence establishes as a matter of law that Knox acted in a bona fide exercise of his own rights. For example, Skewes of General testified that in April 1993, Watson and Mangold asked him to find information on Taylor. Skewes, in turn, called Knox, who knew Taylor was an MGA, but did not know anything else about Taylor. This, according to appellants, demonstrates Knox's exercising his right to send information on to Watson. Moreover, Knox stated he believed the information in the memo and the lawsuits would be helpful to Watson's business.

Knox, however, has presented no evidence that anyone requested that he send disparaging information about Taylor to Watson in a document he crafted. Appellants have failed to establish Knox was justified in his actions. Appellants' twenty-second and twenty-third points of error are overruled.

### D. Malice

 In their twenty-fourth through twenty-sixth points of error, appellants contend the evidence is legally and factually insufficient to support the jury's finding that Knox acted with malice or the jury's award of punitive damages on appellees' tortious interference claim. To support the recovery of punitive damages on a claim for tortious interference, the plaintiff must show the defendant acted with actual malice or " 'ill-will, spite, evil motive, or purposing the injury of another.' " *Texas Beef Cattle Co.,* 921 S.W.2d at 210 (quoting *Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969)).

 Appellants argue Knox's testimony that he did not intend by sending the lawsuits to put Taylor "out of business," but instead thought sending the lawsuits was "the right thing to do," establishes lack of intent to injure Taylor. Appellees, on the other hand, point to Knox's sending the package to Watson anonymously and his December 7, 1993 letter to Watson, which was an apparent attempt to disclaim responsibility for having sent the package. Knox testified that he did not send anony-

mous packages to anyone other than Watson. Knox's secretary, Angela Hyle, however, directly contradicted his testimony by testifying that Knox had her send the lawsuits anonymously to Munich and General.

We conclude there is more than a scintilla of evidence that Knox acted with malice. Furthermore, the evidence that Knox acted with malice is not against the great weight and preponderance of the evidence. It is the jury's duty to weigh the evidence and the credibility of the witnesses and to resolve any conflicts and inconsistencies in the testimony. *See Murphy v. Fannin Cty. Elec. Coop., Inc.*, 957 S.W.2d 900, 906–07 (Tex.App.—Texarkana 1997, no pet.); *State v. Williams*, 932 S.W.2d 546, 552 (Tex.App.—Tyler 1995), *writ denied*, 940 S.W.2d 583 (Tex.1996) (per curiam). The jury may draw inferences from the facts and choose between conflicting interests. *See Ramo, Inc. v. English*, 500 S.W.2d 461, 467 (Tex.1973). The jury may believe all, some, or none of the testimony of the witness. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951). The award of punitive damages, therefore, was proper. Points of error twenty-four through twenty-six are overruled.

### V. Damages

In points of error six and seven, appellants assert the evidence is neither legally nor factually sufficient to support the jury's finding that Taylor's reputation was damaged. In points of error eight and nine, appellants claim there is neither legally nor factually sufficient evidence to support the award of mental anguish damages. As a preliminary matter, we note the jury charge did not separate damages between the libel and tortious interference claims; but rather, merely asked for a single sum for both causes of action.

Damages which are generally recoverable for defamation include compensation for injuries to reputation or character, mental anguish, and other wrongs, incapable of money valuation. *See*

*Mitre v. Brooks Fashion Stores, Inc.*, 840 S.W.2d 612, 620 (Tex.App.—Corpus Christi 1992, writ denied); *Shearson Lehman Hutton, Inc.*, 806 S.W.2d at 922. In the recovery on a claim of defamation *per se*, the law presumes actual damages and no independent proof of damages to reputation or of mental anguish is required. *See Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984); *Mitre*, 840 S.W.2d at 620; *Tatum*, 749 S.W.2d at 258.

As previously determined, the memo constitutes libel *per se* because it harmed Taylor's business. *See Shearson Lehman Hutton, Inc.*, 806 S.W.2d at 922; *Bradbury*, 788 S.W.2d at 38. Therefore, Taylor's damages for injury to his reputation and mental anguish are presumed on his libel claim. Taylor also sought reputation and mental anguish damages on his tortious interference claim. Because damages on Taylor's libel claim are presumed, we need not address the sufficiency of the evidence supporting the damages on his tortious interference claim. Appellants' points of error six through nine are overruled.

### VI. Lost Profits

In their first five points of error, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's award of lost profits to SMGA. Although the recovery of lost profits does not require that the loss "be susceptible to exact calculation," the plaintiff must do more than demonstrate that he suffered some lost profits. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992) (citing *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938)). Rather, the plaintiff must show the amount of his loss by competent evidence with reasonable certainty. *See id.*

The Texas Supreme Court explained, "[t]he requirement of 'reasonable certain-

ty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Texas Instruments, Inc. v. Teletron Energy Management, Inc.,* 877 S.W.2d 276, 279 (Tex.1994). The court, however, cautioned the "reasonable certainty" test does not lack "clear parameters." *See id.* The court listed the following factors:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Id.*

 What constitutes "reasonably certain" evidence of lost profits involves a fact intensive determination. *See Holt Atherton Indus., Inc.,* 835 S.W.2d at 84. At a minimum, estimates of lost profits must be based upon "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.*

 Elwood Domaschk, appellees' expert witness, determined SMGA's lost profits were $11,553,519. Domaschk calculated SMGA's lost profits on the basis of two assumptions: (1) there had been no interference from Knox, and (2) SMGA would have management agreements with both Titan and Ranger. Domaschk determined SMGA's gross written premiums for 1994 through 2002 to be $179,832,328. Domaschk then calculated the expenses for the same period of time at $145,632,120. Subtracting the expenses from the gross premiums, Domaschk determined the amount SMGA would make on writing those premiums to be $34,200,208.

Next, Domashck considered how SGI/SMGA performed in light of Knox's interference. Domaschk determined gross pre-

miums to be $109,966,346; expenses to be $90,062,512; and profit on gross premiums to be $19,903,834. Domaschk then calculated the amount of lost profits for 1994 through 2002 by taking the difference between the profits with and without Knox's interference. This amount was $14,296,374. Using a 7% discount factor to determine the amount of lost profits if paid out today, Domaschk concluded that SMGA's lost profits totaled $11,553,519.

Domaschk testified his projected net written premiums were reasonable based upon the experience of insurance companies similar to SMGA, SMGA's performance in relation to the surety industry as a whole, and the historical results of SMGA. Domaschk assumed the company would have a 7.5% loss ratio based on a conservative estimate of what he thought the losses could be and on what the loss ratio was when SMGA was with Titan, which was 3%. Domaschk also based his calculations on a 25% growth rate.

Patrice Ferguson was retained as appellant's expert witness to review Domaschk's report. Ferguson states she relied on financial statements, tax returns, and industry publications and statistics. She additionally reviewed Knox's published annual statements for Universal and interviewed Knox for insights into the industry. Using the same models as Domaschk, Ferguson calculated lost profits at $895,791 for two contracts and $192,957 for one contract.

Ferguson testified that she identified several problems with Domaschk's report. First, Fergsuon questioned the 25% growth rate Domaschk used. Ferguson instead used a 6% growth rate, which she opined was twice the projected growth rate based on historical growth rates in the industry. According to several industry publications—the Surety Association of America, Standard & Poors, and Best's Review—the average growth rate for the top twenty-five companies in 1993 and 1994 was 2.8%. Second, Ferguson used a 16% loss ratio, which she based upon historical information from the Surety Associ-

ation of America for 1993 and 1994. She testified that she did not see anything in Domaschk's work papers to show that he relied on anything other than Taylor's historical representations in using the 7.5% loss ratio. Third, Ferguson questioned Domaschk's use of a 7% discount rate or "risk free rate." According to Ferguson, it is not appropriate to use the risk free rate for the contract surety business because it is not "risk free." Ferguson used a 30% discount rate.

Ferguson also questioned Domaschk's assumption that SMGA would have had contracts with both Titan and Ranger. Appellants presented testimony from Ed Frank that it would be difficult to have MGA arrangements with two carriers such as Titan and Ranger because they do similar business. SMGA, therefore, would be in a position of compromising one company in favor of the other.

Appellees, on the other hand, presented testimony from Friedberg, former president of Ranger, that he would not have been opposed to SMGA having a contract with another insurance company if the two companies are not writing the exact same business. He further stated it is unlikely that two insurance companies would be writing the exact same business. Mangold testified that he would "not necessarily" have a problem having a contract with an MGA which also wrote contract surety for another insurance company.

Appellants contend that appellees' figures are based on conjecture and speculation. They point to the fact that the total figures changed over the duration of the trial and litigation as confirmation of this assertion. On March 20, 1995, Taylor testified at trial that SMGA suffered lost profits in the amount of $9,500,000. Domaschk testified at trial on March 25, 1995, that SMGA's lost profits totalled $11,500,-000—a difference of $2,000,000. Also, Domaschk's opinion in September 1995, six months prior to trial, was $9,340,829 in lost profits. Domaschk altered his opinion by over $2,000,000 in six months.

■■ Appellants also claim the jury's finding of $2,700,000 in lost profits could be based only upon speculation and conjecture because Domaschk and Ferguson presented figures upon which the jury's award could not be based. A jury may not arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial. *See First State Bank v. Keilman,* 851 S.W.2d 914, 930 (Tex.App.—Austin 1993, writ denied). In other words, a jury may not " 'pull figures out of a hat;' " a rational basis for the calculation must exist. *Keilman,* 851 S.W.2d at 930 (quoting *Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 372 (5th Cir .1990)). A jury, however, has the discretion to award damages within the range of evidence presented at trial. *See City of Houston v. Harris County Outdoor Advertising Ass'n,* 879 S.W.2d 322, 334 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

■■ While is not clear how the jury arrived at this figure, a trier of fact has the discretion to award damages within the range of the evidence presented at trial. *See Howell Crude Oil Co. v. Donna Ref. Partners, Ltd.,* 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also First State Bank,* 851 S.W.2d at 930 (noting that jury's findings are not disregarded because its reasoning in arriving at figure is unclear). Appellees presented evidence of lost profits of $9,300,000 to $11,500,000, while appellants' figures ranged from $895,791 to $192,957. Given the "flaws" in Domaschk's calculations of lost profits as pointed out by appellants, the jury concluded a lesser amount was more appropriate. The jury's award of $2,700,000 is clearly within the parameters established by appellants and appellees. *See Howell Crude Oil Co.,* 928 S.W.2d at 108; *see also America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 629 (Tex.App.—San Antonio 1996, writ denied) (observing that the jury "did not unquestioningly accept" the testimony

of the plaintiff's expert, but rather reduced the amount of damages "presumably based on certain challenges made by [the defendant] to the expert's model"); *Verette v. Travelers Indem. Co.*, 645 S.W.2d 562, 570 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.) (noting the jury "did not accept [the plaintiff's expert's] optimistic opinions" and awarded lower amount of damages accordingly). Where the range of the jury's answer is not restricted by the substantive law granting the remedy, the jury may consider conflicting expert testimony on a particular issue and, using its judgment as the finder of fact, blend that testimony to arrive at a proper verdict. *See Lindgren v.. Delta Inv.*, 936 S.W.2d 422, 425 (Tex.App.—Austin 1996, writ denied) (citing *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 529 (Tex.1995)). Appellants first through fifth points of error are overruled.

### VII. Exclusion of Evidence

■■■■ In point of error twenty-seven, appellants claim the trial court erred in excluding certain evidence. The admission or exclusion of evidence rests within the sound discretion of the trial court. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). To obtain reversal of a judgment based upon error in the admission or exclusion of evidence, the appellant must show (1) the trial court did in fact commit error, and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See Gee*, 765 S.W.2d at 396; *Bridges v. City of Richardson*, 163 Tex. 292, 354 S.W.2d 366, 368 (1962) (per curiam); *Parkway Hosp., Inc. v. Lee*, 946 S.W.2d 580, 583 (Tex.App.—Houston [14th Dist.] 1997, writ denied); *see also* TEX.R.APP.P. 81(b) (current version at TEX.R.APP.P. 44.1). An appellant seeking reversal of a judgment based on evidentiary error does not need to prove "that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment." *Alvarado*, 897 S.W.2d at 753 (citing *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex.1992)). The appellant must show that the judgment turns on the particular excluded or admitted evidence. *See id.* at 753–54; *Port Terminal R.R. Ass'n v. Richardson*, 808 S.W.2d 501, 510 (Tex.App.—Houston [14th Dist.] 1991, writ denied). In making this determination, we must review the entire record. *See Alvarado*, 897 S.W.2d at 754; *Jamail v. Anchor Mortgage Servs., Inc.*, 809 S.W.2d 221, 223 (Tex.1991) (per curiam). The erroneous admission of evidence that is merely cumulative and does not concern a material issue dispositive of the case is harmless error. *See Gee*, 765 S.W.2d at 396; *McInnes v. Yamaha Motor Corp. U.S.A.*, 673 S.W.2d 185, 188 (Tex. 1984).

■■■ Appellants offered into evidence twenty-four exhibits comprised of certain business records from Alexander Reinsurance (Alexander), the reinsurance intermediary for Titan's contract surety business during 1993. According to appellants, the Alexander records, which the trial court excluded, contained evidence that confirmed Titan's reasons for exiting the contract surety business-evidence regarding Titan's problems prior to the publication of the memo by Knox such as obtaining reinsurance and financial losses on a bond issued. Appellants further claim the evidence demonstrated inconsistent statements and admissions by Taylor. Appellants maintain that if the records had been admitted, the jury would have not have found that they had tortiously interfered with the Titan/SMGA contract.

Appellees objected to the admission of the Alexander documents on several bases, including hearsay and the failure to lay the proper predicate necessary for the business records exception to the hearsay rule—specifically that the records were prepared by a person with knowledge. Rule 803(6) of the Texas Rules of Evidence provides:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

TEX.R.EVID. 803(6).

In their bill of exception, appellants read the deposition on written questions of Richard Carlson of Alexander:

MR. CAHILL: "State your full name, occupation, and title.

"ANSWER: Richard Carlson, custodian of records, Alexander Reinsurance.

* * *

"QUESTION: Are these documents under your care, supervision, direction, custody and/or control?

"ANSWER: Yes.

"QUESTION: Were these records made or caused to be made in the regular course of the business of your company?

"ANSWER: Yes.

"QUESTION: Was it in the regular course of your company's business for a person to transmit the information contained and included in these records?

"ANSWER: Some of the records are for internal purposes only and not transmitted to anyone.

"QUESTION: Were these documents made at or near the time of the events reflected in the documents?
"ANSWER: Yes."

Appellants argue it is not necessary for the custodian to have personal knowledge of the information contained in the record. *See Connor v. Wright,* 737 S.W.2d 42, 44–45 (Tex.App.—San Antonio 1987, no writ); *Clark v. Walker–Kurth Lumber Co.,* 689 S.W.2d 275, 281 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). We agree with this statement of the law. Carlson, however, failed to establish the information contained in the Alexander documents came from a "person with knowledge" of that information. Therefore, the necessary predicate for the admission of the business records was not established in accordance with rule 803(6). *See Sholdra v. Bluebonnet Sav. Bank, FSB,* 858 S.W.2d 533, 535 (Tex.App.—Fort Worth 1993, writ denied).[12]

Appellants also assert certain Alexander documents are admissible as admissions by a party opponent and/or prior inconsistent statements by Taylor. *See* TEX.R.EVID. 801(e)(2); 803(24). Hearsay within hearsay is admissible "if each part of the combined statements conforms with an exception to the hearsay rule." TEX.R .EVID. 805. A review of the Alexander records reveals that they contain memoranda, letters, and reports based upon accounts of conversations with others. As we have already determined, Carlson's deposition upon written questions does not meet the requirements for establishing the proper predicate for admitting the documents under the business records exception to the hearsay rule. Therefore, the judge properly excluded the Alexander documents because not all levels of hearsay contained within those documents satisfy an exception to the hearsay rule.

12. Appellants assert appellees' objections to the admission of the Alexander documents did not specify which statements in the tendered documents contained hearsay. We note appellants tendered all the Alexander documents through the deposition upon written questions of Alexander's custodian of records. Therefore, appellees' objection for failure to lay the proper predicate was sufficient to alert the trial court of its ground for excluding the records. *See* TEX R.APP.P. 52(a) (current version at TEX.R.APP.P. 33.1(a)).

In any event, even if the trial court erred in excluding the Alexander documents on the basis that they did not fall within any exception to the hearsay rule, a review of the documents establishes that they are cumulative of evidence previously presented regarding Titan's ability to obtain reinsurance and of prior testimony regarding problems existing prior to Taylor becoming its MGA. Therefore, such error, if any, was harmless. Appellant's twenty-seventh point of error is overruled.

## VIII. Net Worth

In point of error twenty-eight, appellants claim the trial court erred in admitting evidence of their net worth during the liability stage of the trial. Appellants assert the trial court, over their objections, admitted two exhibits, Nos. 58 and 75, during the appellees' cross-examinations of Knox and Ferguson, which purportedly demonstrated appellants' net worth. The net worth of a party is not admissible during the liability phase of a bifurcated trial. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994). Appellants claim they were prejudiced to the extent that it caused the rendition of an improper judgment requiring reversal.

With respect to exhibit No. 58, which was admitted during the testimony of Knox, a review of the record reveals that although appellants objected to admission of this exhibit, they did not object on the basis that it was improper to introduce it during the liability phase of the trial because it demonstrated their net worth.[13] Appellants may not raise a complaint on appeal which does not comport with its objection at trial. *See* Tex.R.App.P. 52(a) (current version at Tex.R.App.P. 33.1(a)).

In any event, exhibit No. 58 does not reveal appellants' net worth, but rather shows the amount of direct written premiums Universal wrote in certain years, which was relevant to Knox's testimony regarding the rate of growth for Universal in comparison to the rate of growth for SMGA.

With respect to exhibit No. 75, the record reflects that appellants preserved error on this point. Exhibit No. 75 is a comparison of Universal with other insurance companies as to direct premiums, expenses, and net income, but not net worth. Moreover, Ferguson testified that she relied on this exhibit in formulating her expert opinions. Therefore, it was proper for the trial court to admit this exhibit. *See* Tex.R.Evid. 705(a). Appellants' twenty-eighth point of error is overruled.

## IX. Prejudgment Interest

In points of error twenty-nine through thirty-two, appellants claim the trial court erred in assessing prejudgment interest on damages awarded to appellees based upon the calculation established in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). Recently, the Texas Supreme Court modified the standard for determining prejudgment interest. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998). Overruling its previous ruling in *Cavnar v. Quality Control Parking, Inc.*, which had held a prevailing plaintiff could recover prejudgment interest "compounded daily," the supreme court instead held prejudgment interest is to be computed as simple interest. *See id.* at 532.

Here, the parties agree that *Johnson & Higgins* controls the calculation of pre-

---

**13.** At the time this exhibit was offered, appellants' counsel made the following objections:
MS. JONES: I will object to this document. It has attorney's comments or writing all over it. It is also talking about direct written premiums.
\* \* \*
MS. JONES: It has dollar figures on it that we talked about. We don't have those dol-

lar figures. He can show him with percentages, that's fine.
\* \* \*
MS. JONES: He's going to outline for years and what their dollars have been.
\* \* \*
MS. JONES: In going to object, Your Honor.

judgment interest in this case. The trial court awarded prejudgment interest on $850,000 and $2,700,000 from December 27, 1993, through April 17, 1996, at a rate of 10%, compounded daily. The parties stipulated to the amount of prejudgment interest if the judgment were affirmed.[14] Therefore, we need not address these points of error.

Accordingly, the judgment of the trial court is affirmed.

14. The parties also submitted to this court calculations based on prejudgment interest being calculated on the basis of annual compounding. The Texas Supreme Court in a superceded opinion had held prejudgment interest was to be calculated as "simple interest, compounded annually." *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 41 Tex.Sup.Ct.J. 201, 220, 1997 WL 760280 (December 11, 1997). The court, however, dropped the phrase "compounded annually," when it reissued the opinion.