**Opinion issued March 26, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00473-CV

————————————

### AVA WASHINGTON, Appellant

### V.

### MARGARET VICTORIA, Appellee

On Appeal from the Probate Court No. 4
Harris County, Texas
Trial Court Case No. 454297

## MEMORANDUM OPINION

Billy Washington executed a will naming his daughter Ava Washington as his beneficiary. Four years later, while in hospice care for terminal cancer, Billy executed a second will designating his longtime-girlfriend, Margaret Victoria, as his primary beneficiary. When Margaret sought to admit the second will to

probate, Ava filed an application to set it aside. She alleged that Billy lacked testamentary capacity to execute the second will and that the will was the result of undue influence.

The jury found in favor of Margaret finding that Billy had testamentary capacity to execute the second will and that there had been no undue influence. The court entered a final judgment on the jury's verdict and this appeal ensued.

Ava raises two issues on appeal. She first argues that the trial court erred in admitting testimony from Margaret and her witnesses about Billy's alleged anger toward Ava involving the alleged taking of his money, and further by precluding Ava from presenting evidence in response to such testimony. In her second issue, she argues there was legally and factually insufficient evidence to support the jury's finding that Billy had testamentary capacity when he executed the second will.[1]

We conclude there is legally sufficient evidence supporting the jury's finding of testamentary capacity. We hold, however, that the trial court abused its discretion by excluding testimony and that the error resulted in harm.[2]

We reverse and remand.

## Background

In 2012, Billy Washinton executed an eleven-page will naming his daughter

---

[1] Ava does not appeal the jury's finding on undue influence.

[2] Given our disposition, we need not reach Ava's factual sufficiency challenge.

Appellant Ava Washington as his beneficiary.

Four years later, in the summer of 2016, Billy was diagnosed with stomach cancer resulting in several hospitalizations in the ensuing months. Doctors ultimately informed Billy that he had terminal cancer, and he received hospice care at his home starting in December until his death on December 20, 2016.

On December 16, four days before his death, Billy executed a three-page will naming Appellee Margaret Victoria, his longtime girlfriend, as his primary beneficiary ("2016 Will").[3, 4]

Ava filed an application to probate the first will signed in 2012, and the trial court granted her application in January 2017. Shortly after, Margaret filed an application to probate the 2016 Will and an application to set aside the court's order probating the first will. She alleged that the first will was a forgery, that the will was the product of undue influence, and that Ava had engaged in fraud. She asserted that Ava had "tricked" Billy into signing a power of attorney to access his bank accounts and transfer his funds to a separate account in her name. Margaret alleged that, after authorities were involved, Ava returned the funds via a cashier's check "to avoid prosecution" and Billy revoked the durable power of attorney.

---

[3]    In the 2016 Will, Billy left one dollar each to Ava and her sister, Debra Jarmon, one thousand dollars to his stepdaughter, and the remainder of his estate to Margaret.

[4]    The 2012 Will appointed Ava executor, and the 2016 Will appointed Margaret executor.

Ava contested Margaret's application to probate the 2016 Will, arguing that Billy lacked testamentary capacity to execute the will because at the time he signed the will, Billy was suffering from several infirmities, as reflected in his hospice records. She alleged that Billy was forgetful, depressed, withdrawn, unable to walk or read, unable to eat or drink water, unable to communicate, confused, drowsy, taking pain medication, and further that his speech was unclear, and he did not know what day it was. Ava also argued that the 2016 Will was the product of undue influence. She alleged that while Billy was in "extreme discomfort and dying, [Margaret] exploited [him] causing him to execute a [w]ill which he would never have executed but for her undue influence."

The case proceeded to trial. The jury was asked to determine whether Billy had testamentary capacity to sign the 2016 Will and whether he signed the 2016 Will as the result of undue influence. The jury returned a verdict finding that Billy had testamentary capacity when he executed the 2016 Will and that Billy had not signed the 2016 Will as the result of undue influence. The jury also found that Margaret had acted in good faith and with just cause in prosecuting the suit for the purpose of having the 2016 Will admitted to probate, and that Ava had acted in good faith and with just cause in contesting the admission of the 2016 Will to probate.

4

The jury awarded attorneys' fees to Margaret and Ava. Ava filed a motion for judgment notwithstanding the verdict and subsequently, a motion for new trial. The record does not reflect a ruling on either motion.

This appeal ensued.

## Legal Sufficiency

In her second issue, Ava argues that the evidence is legally insufficient to support the jury's finding that Billy had testamentary capacity when he executed the 2016 Will.

## A.     Standard of Review

When as here, an appellant challenges the legal sufficiency of an adverse finding on an issue on which she did not have the burden of proof, the appellant must demonstrate on appeal that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011); *ESP Resources, Inc. v. BWC Mgmt.*, No. 01-15-00680-CV, 2016 WL 828285 at *6 (Tex. App.—Houston 1st Dist.] March 3, 2016 no pet.). We will sustain a no-evidence challenge if there is "a complete absence of evidence of a vital fact," "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact," "the evidence offered to prove a vital fact is no more than a mere scintilla," or "the evidence establishes conclusively the opposite of the vital fact." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.

2005) (citation omitted).

Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists. *In re Estate of Ewers*, 695 S.W.3d 603, 619 (Tex. App.—Houston [1st Dist.] 2024, no pet) (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). More than a scintilla of evidence is present when the evidence "'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *King Ranch*, 118 S.W.3d at 751). "Evidence is conclusive only if reasonable people could not differ in their conclusions[.]" *City of Keller*, 168 S.W.3d at 816.

We review the evidence in the light most favorable to the factfinder's finding, crediting all favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 807, 821–22. The ultimate question is whether the proof, viewed in that light, would permit reasonable and fair-minded jurors to reach the verdict under review. *Id.* at 827; *In re Estate of Ewers*, 695 S.W.3d at 619. The fact finder is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.* We may not substitute our judgment for that of the factfinder, "even if a different answer could be reached on the evidence." *Bracewell v. Bracewell*, 20 S.W.3d 14, 23 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.)).

**B.      Testamentary Capacity**

To probate a will, a trial court must first determine whether the will is valid. *Bracewell*, 20 S.W.3d at 19. This requires proof that at the time of execution, the testator had a "sound mind," which courts have interpreted to mean "testamentary capacity." *Id.* "The key inquiry is whether the testator had testamentary capacity on the day the will was executed, which 'may be inferred from lay and expert witnesses' observation of the testator's conduct prior to or subsequent to the will's execution.'" *In re Estate of Danford*, 550 S.W.3d 275, 281 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *In re Estate of O'Neil*, No. 04-11-00586-CV, 2012 WL 3776490, at *6 (Tex. App.—San Antonio Aug. 31, 2012, no pet.) (mem. op.)).

The term "testamentary capacity" means that the testator possessed "sufficient mental ability, at the time of execution of the will, to understand the business in which [he was] engaged, the effect of [his] act in making the will, and the general nature and extent of his property." *Bracewell*, 20 S.W.3d at 19. The testator must "know [his] next of kin and the natural objects of [his] bounty, and [he] must have 'sufficient memory to assimilate the elements of the business to be transacted, to hold those elements long enough to perceive their obvious relation to each other and to form a reasonable judgment as to them." *Id.* (quoting *Jones v. LaFargue*, 758 S.W.2d 320, 325 (Tex. App.—Houston [14th Dist.] 1988, writ

denied)); *see also In re Estate of Arrington*, 365 S.W.3d 463, 468 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Prather v. McClelland*, 76 Tex. 574, 584–85, 13 S.W. 543, 545–46 (1890)) (same). "While the jury must be able to find support in the evidence for each of these elements, witnesses need not specifically recite the wording as set out in each element." *Wilson v. Estate of Wilson*, 593 S.W.2d 789, 791 (Tex. App.—Dallas 1979, no writ).

The jury charge correctly assigned the burden of proving testamentary capacity to Margaret.[5] With respect to testamentary capacity, the charge stated:

> A decedent has testamentary capacity if, at the time the decedent signs a will, the decedent—
>
> 1. Has sufficient mental ability to understand that he is making a will; and
>
> 2. Has sufficient mental ability to understand the effect of his act in making the will; and
>
> 3. Has sufficient mental ability to understand the general nature and extent of his property; and
>
> 4. Has sufficient mental ability to know his next of kin and natural objects of his bounty and their claims on him; and
>
> 5. Has sufficient mental ability to collect in his mind the elements

---

[5] As the proponent of the 2016 Will, Margaret had the burden of establishing testamentary capacity. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *See In re Estate of Wlecyk*, No. 01-19-00299-CV, 2021 WL 1537489, at *5 (Tex. App.—Houston [1st Dist.] Apr. 20, 2021, no pet.) (mem. op.) (noting burden of proving testamentary capacity on proponent who offers will for probate) (citing *Guthrie v. Suiter*, 934 S.W.2d 820, 829 (Tex. App.—Houston [1st Dist.] 1996, no writ)).

of the business to be transacted and to be able to hold the elements long enough to perceive their obvious relation to each other and to be able to form reasonable judgment as to these elements. [6]

The jury was asked to determine whether Billy had testamentary capacity to sign the 2016 Will, and the jury answered, "Yes."

## C. Analysis

Ava argues the evidence is legally insufficient to sustain the jury's finding that Billy had testamentary capacity to sign the 2016 Will because the only evidence regarding the third element of testamentary capacity—whether Billy had sufficient mental ability to understand the general nature and extent of his property—"showed that Billy did not recall significant assets that he owned days before he executed the 2016 Will[.]"

Ava focuses on a form filled out by a social worker on December 15, 2016—the day before Billy executed the 2016 Will—arguing that the form reflects that on December 15, "Billy told the social worker that he did not own a 'savings account,' 'other property,' or 'other assets.'" Ava argues that what Billy told the social worker was a "complete detachment from reality" because Billy had

---

[6]     Neither party objected to this instruction. We are thus bound to review the evidence in light of the jury charge as given. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000); *see also See Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (stating that assessment of evidence "must be made in light of the jury charge that the district court gave without objection").

9

"substantial savings accounts" with funds between $230,000 to $300,000, and he "owned several pieces of real estate."

Margaret responds that when Billy signed the 2016 Will on December 16, he "was dying and did not want to detail his assets," as he was "a private man who did not feel obligated to do what he did not want to do."[7] She argues that Billy's "desire not to disclose information about his assets does not mean that he could not understand what they were." She further argues that "[j]ust as [Billy] knew his financial assets when he discussed his bank accounts with Detective Webb [in the fall of 2016], no condition existed which would cause [Billy] to have forgotten or become unable to understand his assets" when he signed the 2016 Will in December 2016.

In reviewing the legal sufficiency of the jury's verdict with respect to testamentary capacity, we must review the evidence in the light most favorable to the factfinder's finding, crediting all favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Dillon v. King*, No. 05-20-00215-CV, 2022 WL 1401403, at *12 (Tex. App.— Dallas May 4, 2022, no pet.) (mem. op.) (citing *Guillory v. Dietrich*, 598 S.W.3d 284, 293 (Tex. App.—Dallas 2020, pet. denied)).

---

[7] Margaret's counsel argued in closing that Billy was "a stubborn old codger, he just was, and he was a private man, and he didn't put his business on the street. So he had no obligation to answer" the social worker's questions.

During trial, the jury heard testimony from several witnesses, including Margaret, her sister Jeannette Shepherd, her friend Jeannette Hardin, Shirley Baham (the person who typed the 2016 Will), Ruthie Mitchell (the notary who notarized the 2016 Will), Detective Jacob Webb, Jr. (an officer who met with Billy in October 2016), Ava, her sister Debra Jarmon, Dr. Abbas A. Ali (a psychiatrist specializing in geriatric psychiatry), and Dr. George S. Glass (a psychiatrist who testified about testamentary capacity). The following evidence is relevant to our review.

### Shirley Baham

Shirley Baham testified that she lived across the street from Margaret and Billy, and she was friends with them. According to Baham, she and Margaret had coffee frequently, and she routinely had conversations with Billy. She testified that Billy and Margaret were a loving couple who were more than "just friends." She testified that Billy did what he wanted, and "if he didn't want to do it, he didn't do it." Baham typed the 2016 Will based on a piece of paper she received from Billy at his house in October 2016. According to Baham, Billy pointed out a typo in his address when reviewing the 2016 Will and she made the correction.

Baham witnessed the signing of the 2016 Will on December 16. She testified that Billy understood her when he signed the 2016 Will, that he knew who she was, and that he was not confused or delirious. Billy was awake and alert when he

signed the 2016 Will. Baham testified that Billy signed the 2016 Will in his living room.[8] Baham also testified during trial that she did not recall where Billy signed the 2016 Will. Baham stated she was sure Billy knew the extent of his property when he signed the 2016 Will, but she conceded that she and Billy did not discuss his property that day. Baham saw Billy between December 16, when the 2016 Will was signed, and December 20, when he died, and she never saw an instance when Billy did not make sense, was not able to talk, or did not recognize her.

Baham testified that it was her idea to leave Ava one dollar in the 2016 Will and she had no doubt that Billy wanted Margaret to have his estate. She testified that Billy was depressed, sad, and angry in December 2016, and that she had no doubt there was a reason for Billy to redo his earlier will. When asked whether Billy had signed the 2016 Will because Margaret told him to do so, she responded, "Not to my knowledge." According to Baham, there was another reason that was "understandable," and that is what Billy "was angry about."

### Margaret Victoria

Margaret testified that she met Billy in 1966, when she was 23 and he was "[a]bout 39." Billy was divorced. According to Margaret, they began living together around 1978, and he gave her a diamond ring that year. They were together until the day he died.

---

[8] During her deposition, Baham testified that Billy signed the 2016 Will while he was in bed.

12

Margaret testified that Billy was a maintenance man at Grocers Supply, and he worked there for "many years." Billy also earned money through his rental properties. Margaret testified that money was important to Billy and he kept track of his assets. Billy did not tell her at first that he had cancer. She first learned of the cancer in July 2016 when Billy had surgery. She did not realize until "the end" that Billy was going to die. Margaret testified that she took care of Billy at home from August through December 2016. During that time, Margaret testified that Billy was never delusional.

According to Margaret, she did not tell Baham what Billy wanted in the 2016 Will, but she saw the will before Billy died. Margaret was at the house for the signing of the 2016 Will, and so was her sister Jeannette Shephard, her friend Jeannette Hardin, her nephew Jesus, Baham, Lena Bryant, Ruthie Mitchell, and a handyman.[9] Margaret testified that Billy wanted Mitchell to notarize the 2016 Will because "[h]e just didn't trust people anymore" at the end of his life. At Billy's request, Baham contacted Mitchell about notarizing the 2016 Will.

According to Margaret, the 2016 Will was signed in the living room and she witnessed the signing.[10] Margaret testified that Billy was not hesitant about signing the 2016 Will. He was "very alert," not confused, delusional, or hesitant. He was

---

[9]     Bryant and Baham were the official witnesses to the will.

[10]     During her deposition, Margaret testified that the 2016 Will was signed in the bedroom.

able to speak intelligently. Margaret testified that when Billy signed the 2016 Will, he "kn[e]w what he was doing. He was sound and in his right mind, capable of what he was doing." Although Margaret testified that Billy was competent to sign documents a few days before he signed the 2016 Will, she acknowledged that she signed three documents for Billy on December 10 because, according to the medical records, he was "extremely weak." She also signed a document for him on December 14. Margaret also signed several documents in her capacity as "patient care giver" in the days leading up to the execution of the 2016 Will.

Medical records from December indicated that Billy was "forgetful," had "an inability to recognize problems," and had "cognitive impairment." Margaret disputed some of these medical records. She denied, for example, that Billy was forgetful, disoriented, or confused between December 12 and December 14. She also disputed that he was too weak to sign a document. Margaret testified that Billy did not want to be questioned by medical staff, and sometimes he refused to answer questions "[b]ecause it was making him answer questions that he thought wasn't even necessary. . . " but he was "able to answer." Margaret disagreed to the extent medical records indicated Billy was "extremely weak" or only spoke a few words. She testified that Billy "wasn't confused." Margaret testified that on December 14, Billy was alert and responsive, consistent with the medical records, but not forgetful, which was inconsistent with the records.

14

Margaret initially testified that she did not see Felix Perez—the social worker—when he came to the house on December 15. She later testified that Perez talked only to her when he came by the house and he did not speak to Billy. Margaret was shown the medical form completed by Perez on December 15, which indicated that Billy had no savings accounts or other property or assets other than his home. Margaret testified that Perez had not asked Billy about his assets on December 15. Perez also checked boxes on the form indicating Billy was alert and oriented. He did not check off "lethargic," "forgetful," "confused," "poor memory," "disoriented," "unconscious," "sad," "flat affect," "fearful," "withdrawn," "stressed," "fearful," "angry," or "anxious." Margaret agreed with the assessment that on December 15, Billy was alert, oriented, not forgetful, not lethargic, not confused, did not have a poor short-term memory, was not disoriented, not unconscious, and was emotionally stable.

Margaret testified that prior to signing the 2016 Will, Billy had been frustrated. When asked why Billy was frustrated, she testified it was because of "[t]he taking of our money from the bank." She later testified that by the time he signed the will, Billy had "lost trust" in some people, including Ava.

### *Jeannette Shephard*

Jeannette Shephard is Margaret's sister. She testified that Billy was proud of the money he had amassed. In October 2016, she was with Billy and Margaret at

15

their house. At Billy's request, she began to write his "Last Will and Testament" on a tablet of paper. She had to leave so she gave the tablet of paper to Billy, who then gave it to Baham. Shephard testified that in the last year of Billy's life, she never saw him delirious or confused about who he was or who others were. She testified that Billy signed the 2016 Will in the living room sitting on the sofa. Billy was "calm, cool, and in his right mind" and not confused when he signed the 2016 Will. Based on what she observed on December 16 and based on her interactions with Billy the day before, Jeannette testified that she did not believe there was anything preventing Billy from knowing what he was doing when he signed the 2016 Will. He did not appear to be groggy or forgetful. His speech was clear.

### Jeannette Hardin

Jeannette Hardin was friends with Billy and Margaret. She testified that she saw Billy sign the 2016 Will. Hardin testified that Billy reviewed the 2016 Will before he signed it and that it was his decision to sign it. She said Billy signed the will in the bedroom. She did not see Billy in pain on the day he signed the 2016 Will. Hardin testified that when she spoke to Billy that day, he spoke clearly. He was not confused, forgetful, or drowsy.

Hardin testified she was at Billy's house when he met with Detective Webb of the Houston Police Department in October 2016. She testified that Billy was angry at his daughter Ava. Hardin also saw Billy the day before he died for "a little

16

bit" and they talked. According to Hardin, Billy was making sense that day. She testified that in all the times she visited with Billy, he did not seem to be out of it, but he was "mad." She also was with Billy the morning he died. They spoke and he recognized her. They said their goodbyes.

### Ruthie Mitchell

Ruthie Mitchell notarized the 2016 Will. She testified that Billy spoke clearly on the day he signed the 2016 Will and did not appear to be confused.

### Detective Jacob Webb, Jr.

Detective Jacob Webb, Jr. is a retired officer from the Houston Police Department and he was the jail administrator for the Fort Bend County Sheriff's Department at time of trial. When he was a police detective, he investigated white collar crimes and dealt a lot with Adult Protective Services. Detective Webb met with Billy at his home in the fall of 2016. They talked for about ninety minutes. Margaret was there but Billy "did all the talking."

Detective Webb testified that Billy was "upset" and "sad" and he appeared angry. Based on what they discussed, Detective Webb believed Billy's feelings were "appropriate."

Detective Webb sensed that Billy was successful and prosperous and had a lot of pride. Detective Webb and Billy discussed Billy's bank accounts, which Detective Webb believed contained "about 300,000-plus." According to Detective

Webb, Billy knew he owned "substantial . . . monetary items." Detective Webb told Billy he could do whatever he wanted with his assets after he died, that he could leave his estate wherever he wanted. Detective Webb told Billy he "needed to contact an attorney, but usually people leave [w]ills or trusts or things of that nature." Detective Webb testified that Billy's concerns were "logical" and that Billy was "very specific, well-spoken."

Although no one was charged with a crime, Detective Webb testified he believed a crime had been committed. He explained that not everyone is willing to file charges when they are upset about something. He stated that for example, people do not always file charges against family members. Detective Webb testified that he spoke to Ava "maybe twice" during his investigation.

### *Dr. Abbas A. Ali*

Dr. Abbas A. Ali—a psychiatrist with a specialty in geriatric psychiatry—testified that after reviewing Billy's medical records, he concluded Billy did not have testamentary capacity to sign the 2016 Will. He testified that there was "no indication" that Billy (1) "knew that he was actually completing a [w]ill," (2) "understood that the document in front of him was a [w]ill," (3) was "able to process the information that would be required to complete the [w]ill," or (4) had "clear knowledge" as to whom he could bequeath his assets. Dr. Ali testified that Billy's condition was "very grave" on December 16, when the 2016 Will was

18

executed. Dr. Ali stated the hospice records reflected Billy was "in a lot of pain," was not "actually verbally interacting" with hospice staff and could not care for himself.

Dr. Ali noted that Billy was unable to sign the hospice consent form on December 10, because he was "extremely weak." The psychological exam performed by the nurse reflected that Billy was alert but forgetful, and confused at times. Billy was a fall risk for several reasons including visual impairment, impaired functional mobility, and cognitive impairment. Billy was prescribed several medications that could cause confusion. Dr. Ali also testified about some of the medical records from Billy's hospice care. Some records reflected that hospice care came to Billy's house on December 12, because Billy cut his biliary shunt and urinary catheters and Margaret was concerned. Billy did not recall having cut the catheters. Billy was taken to the hospital for treatment after cutting the lines. He was discharged on December 14 and taken home via ambulance. Billy did not sign a consent form for hospice care because he was "extremely weak" on December 14.

Dr. Ali also testified about the psychological status notes in medical records dated December 14. Those records included notations that Billy was "forgetful, "constantly confused," alert, and semi-responsive. In addition, his speech was "garbled." The records noted that Billy was "extremely weak," "bed-bound,"

19

"more confused," and experiencing "pain with movement." Dr. Ali reviewed an assessment performed by Perez—the social worker—on December 15. According to Dr. Ali, it was unclear from the record whether Perez actually had spoken to Billy, but the "default assumption" was that Billy answered the questions about his assets, where he denied owning other property of value or a savings account.[11]

Dr. Ali testified that in his opinion, Billy's cognitive function from December 10 to December 16, was "[i]mpaired and worsening." He testified that to a "reasonable degree of medical probability," Billy did not have testamentary capacity on December 16. Dr. Ali did not see "any evidence" indicating Billy had "enough ability, enough cognition, enough physical ability to complete a [w]ill." He said Billy was "less and less aware of his surroundings and less and less able to participate in conversation, virtually any interaction with others around him." Dr Ali testified Billy could have been prone to delirium because he "was not eating or drinking virtually anything" and he was receiving "opioid medication which can compromise one's cognition." The fact Billy cut his catheter and shunt lines suggested "impulsive or unpredictable" behavior that was not in his best interest.

Dr. Ali noted that the social worker's assessment on December 15 indicated that Billy was alert and oriented and had stable emotional status. The assessment did not indicate Billy was forgetful, lethargic, confused, had poor short-term

---

[11] The social worker did not testify at trial.

20

memory, was disoriented, unconscious, tearful, withdrawn, stressed, fearful, angry, or anxious. The assessment indicated that Billy "[c]ommunicate[d] well and understands at all times." Dr. Ali testified he had some concerns about the social worker's December 15 assessment because Billy's responses to questions about his assets were "not consistent with what was in the [2016] [W]ill[.]" He testified, "testamentary capacity requires more than simply being alert . . . it's also awareness and knowledge of one's assets 'cause those are what's going to be given away at one's passing." In the absence of such knowledge, Dr. Ali had "concern" about Billy's "ability to have testamentary capacity, even the next day."

### Dr. George S. Glass

Dr. Glass, a psychiatrist, testified that based on medical records, Billy had "moments of confusion at different times" but generally he "knew what was happening." The social worker's assessment notes from December 15 indicated that Billy was "alert, oriented, not forgetful, not lethargic, not confused, nor poor short-term memory, and not disoriented, not unconscious and stable." He testified that there were "transient periods" of time when Billy was confused. Dr. Glass testified that Billy "had the mental capacity to make knowledgeable decisions about his finances and when he entered into banking contracts, his estate, and his disposition of the estate and that he had testamentary capacity when he had this 2016 Will prepared and when it was executed." He testified that Billy asked for the

2016 Will to be brought over and when he had it written up, "he knew exactly what he was doing." For example, he picked up on the mistake in his address immediately.

Dr. Glass disagreed with Dr. Ali's conclusion that Billy lacked testamentary capacity to execute the 2016 Will. The fact that Billy cut his catheter and shunt in December 2016 did not, in his opinion, reflect a lack of capacity, as Billy "was subsequently found not to be confused multiple times after that." "The fact that the day before he died, [Billy] was disoriented—I don't think that's relevant." He testified there was no evidence Billy had delirium. The day before the will was signed, Billy "was clearly lucid." Billy "was very clear from what the [w]ill writer said, what he wanted to do and why." Dr. Glass testified that there was "no indication in the records, in the medical records, at any point, then or later, that [Billy] didn't know what he was doing."

Based on the deposition transcripts he read, Dr. Glass saw no evidence that Billy was confused when he signed the 2016 Will. He testified that Billy was not confused "when he did the [2016] Will, had it made, and not when he signed it either time."

### Ava Washington

Ava is the eldest of Billy's two daughters. She first lived with Billy and her grandmother, and later only with Billy until she married at about age 22. Ava had a

"very strongly supportive" relationship with Billy. When she moved out, she visited Billy "[q]uite often."

Ava testified that after receiving Billy's cancer diagnosis,[12] she and Billy went to see a doctor because Billy was having "severe pain." He was admitted to St. Joseph's Hospital. He had surgery and remained hospitalized for about a month and a half. That was in August 2016.

According to Ava, after the surgery, Billy went home and stayed there two or three days. Soon after, Billy tried to drive to Ava's house in Katy, Texas, but instead of driving to Ava's house in Katy, he drove to a house in Missouri City, Texas where Ava had lived more than ten years ago. Ava testified that Margaret called her in the middle of the night to tell her Billy was missing. Billy eventually showed up at Ava's home in Katy, where he stayed for about a month and a half. During some of that time, Billy stayed with Ava's daughter in her house.

Ava testified that while Billy was in her home, he exhibited behavior that showed he was confused. For example, he did not remember Ava's birthday, although he always had before. Billy also would not take his medicine because he thought he had already taken it. He jumped out of the car once. And he could not remember Ava's telephone number.

---

[12]  According to testimony from Ava's son, Quincy Caldwell, the cancer diagnosis was made in July or August 2016.

Billy eventually returned to his house.[13] He lived there until he died on December 20. Ava testified that she "frequently" visited Billy—two or three times a week—while he was living in his house with Margaret. During the last week and a half of his life, she visited Billy "maybe every other day." She would stay one to three hours when she visited. During the visits, Billy was in bed. She testified that she never saw Billy out of bed during her visits. Billy was in pain during that time and did not talk. Ava testified that she saw Billy on December 16. He was "bed-bound," unable to speak, and in pain. She also saw Margaret, Jesus, and "a man from across the street" at Billy's house that day.

Ava testified that she was appointed as the independent executor of Billy's estate under the 2012 Will. She was familiar with Billy's property. In addition to the house he lived in, Billy owned two other homes and had two or three bank accounts with a balance of about $230,000. He also had cash in the house "[a]ll the time." Ava testified she did not believe Billy "did that [2016] Will." She testified he "did not sign that [w]ill." She later testified that "somebody" made Billy sign the 2016 Will. She did not believe Billy could have had the 2016 Will prepared of his own accord, or that he would leave her out of his estate.

---

[13]    Ava was not able to testify to exact dates, but Billy was home by October 2016, the month he met with Detective Webb.

24

***Debra Jarmon***

Debra Jarmon, Ava's sister, testified that Billy communicated "exceptionally well" until the day he died. She last spoke with Billy on December 18. When Jarmon saw Billy near his death, he was a "[g]reat communicator. . . . He communicated, but he was too weak to speak." Initially, Jarmon, who received one dollar in the 2016 Will, was a party to the lawsuit. She testified that her "concern was not [Billy's] estate. He left that responsibility to Ava." She said Billy gave her the responsibility of Ava, who was his "biggest responsibility . . . in terms of care, love."

\*     \*     \*

Construing the evidence in the light most favorable to the jury's finding and crediting all favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not, we cannot conclude there is legally insufficient evidence supporting the jury's finding of testamentary capacity. While the December 15 social worker form on which Ava primarily relies indicates that Billy does not own a "savings account," "other property," or "other assets" other than his home, Margaret testified that the social worker did not speak to Billy about his assets on December 15, and Dr. Glass also indicated that it was unclear whether the social worker had actually spoken to Billy on December 15. Ava argues that because the social worker's form was the only evidence

25

concerning the third element of testamentary capacity—whether Billy had sufficient mental ability to understand the general nature and extent of his property—setting that form aside means there is no evidence to support the jury's finding on testamentary capacity. We disagree.

"A finding of testamentary capacity does not hinge entirely on direct evidence that the testator discussed the details of his heirs, wealth, or disposition at the time he signed his will." *In re Estate of Hemsley*, 460 S.W.3d 629, 637 (Tex. App.—El Paso 2014, pet. denied) (citing *In re Estate of Arrington,* 365 S.W.3d at 468). Evidence of a testator's mental condition on the date he signed the will coupled with testimony that the testator knew he was executing a will and had deliberately chosen to leave this estate to his sole beneficiary may be legally sufficient to support a finding of testamentary capacity even if the testator does not discuss his children or the nature of his property on the day of execution. *See id.*

For example, in *In re Estate of Hemsley*, the appellants challenged the legal sufficiency of the trial court's finding that Hemsley had testamentary capacity to execute a will. Like Ava does here, the appellants argued, among other things, that the evidence "was legally insufficient because there [was] no evidence that Hemsley discussed his relatives or the approximate nature of his property with [the person who prepared the will] or the witnesses." *Id.* at 637. The factfinder heard "direct evidence of Hemsley's general mental condition on the day he executed his

will," and each witness who was at the will-signing "recounted that Hemsley knew he was executing his will and he indicated that he had deliberately chosen Bernal to not only be his executor but also the sole beneficiary." *Id.* The court held the evidence was legally sufficient because it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.* (quoting *In re Estate of Arrington*, 365 S.W.3d at 468–69).

Similarly, in *In re Estate of Arrington*, a decedent's wife argued that the proponent of the will—the decedent's daughter—had adduced legally insufficient evidence to establish testamentary capacity because there was no evidence that the decedent discussed his children or the "approximate nature of his property with the witnesses on the date he executed his will." 365 S.W.3d at 468. Explaining that a finding of testamentary capacity does not hinge "entirely on direct evidence that the testator discussed the details of children, wealth, or disposition at the timed he signed his will," we held there was legally sufficient evidence supporting the jury's finding of testamentary capacity because although the jury heard evidence about the decedent's health problems, it also heard "direct evidence of [the decedent's] general mental condition on the day he executed his will and the attending months before and after[]." *Id.* at 468–69. We held the evidence was legally sufficient to support the jury's determination that the decedent knew he was executing a will

and that he had deliberately chosen his daughter to be his sole beneficiary. *Id.* at 469.

We reach the same conclusion here. While there is no evidence that Billy discussed his property or assets on December 16, as we held in *In re Estate of Arrington*, direct evidence that Billy discussed the extent of his wealth on the day he executed his will is not necessary to establish testamentary capacity. *Id.* at 468. There was testimony that nothing prevented Billy from knowing what he was doing when he signed the 2016 Will, that although Billy did not discuss his assets on December 16, Billy knew the extent of his property when he signed the 2016 Will, that Billy "had the mental capacity to make knowledgeable decisions about his finances and when he entered into banking contracts, his estate, and his disposition of the estate and that he had testamentary capacity when he had this 2016 Will prepared and when it was executed," and that when Billy had the 2016 Will written up, "he knew exactly what he was doing." There was also evidence that Billy discussed the nature of his assets with Detective Webb at around the same time Banham testified she started to type up the 2016 Will at Billy's direction.

All who were in attendance when Billy signed the 2016 Will, except Ava,[14]

---

[14]     Ava testified that when she saw Billy on December 16, he was "bed-bound," unable to speak, and in pain. To the extent that there was testimony that Ava was

28

testified that Billy was lucid, that he knew what he was doing, and that he was not confused. Margaret testified that Billy was "very alert" when he signed the will, and he was not confused, delusional, or hesitant to sign it. She testified he was "sound and in his right mind, capable of what he was doing." In addition, the jury heard testimony from four witnesses who were at the will signing, all of whom testified that Billy knew was he was doing and was not confused. This constitutes some evidence supporting the jury's finding that Billy had testamentary capacity when she signed the 2016 Will. The evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review." *See City of Keller*, 168 S.W.3d at 827.

While the witnesses who testified that Billy was lucid when he signed the 2016 Will were friends of Margaret—the will's primary beneficiary—the jury knew the witnesses were interested and the jury was free to consider that in determining how much significance, if any, to assign their testimony. *See In re Doe 4*, 19 S.W.3d 322, 325 (Tex. 2000) ("[B]ecause trial courts can view a witness's demeanor, they are given great latitude in believing or disbelieving a witness's testimony, particularly when the witness is interested in the outcome."); *Mittelsted v. Meriwether*, 661 S.W.3d 867, 903–04 (Tex. App.—Houston [14th Dist.] 2023, pet. denied) ("Although Donovan, Hoffman, and Robbel testified that

---

not at Billy's house that day, Ava testified those witnesses "were confused about that."

Jack seemed 'normal' at the will signing, the jury could consider the fact that Donovan was a named beneficiary under the will and therefore an interested witness at trial. Because they can observe a witness's demeanor, juries are given great latitude as fact finders to believe or disbelieve a witness's testimony, particularly when the witness is interested in the outcome.") (citing *Le v. Nguyen*, No. 14-11-00910-CV, 2012 WL 5266388, at *8 (Tex. App.—Houston [14th Dist.] Oct. 25, 2012, no pet.) (mem. op.)). Similarly, to the extent Ava testified that she was there the day Billy signed the 2016 Will, and that he was confused, bed-bound, unable to speak and in pain, the jury, as the fact finder, was the sole judge of the credibility of witnesses and the weight to be given their testimony. The jury could have chosen to believe some witnesses and to disbelieve others, and we may not substitute our judgment for that of the factfinder, "even if a different answer could be reached on the evidence." *Bracewell*, 20 S.W.3d at 23 (quoting *Knox*, 992 S.W.2d at 50).

We thus hold the evidence was legally sufficient to support the jury's finding of testamentary capacity. We overrule Ava's legal sufficiency challenge.[15]

## Evidentiary Issue

In her first issue, Ava argues the trial court abused its discretion by

---

[15] Ava also raises a factual sufficiency challenge supporting the jury's finding of testamentary capacity. Given our disposition of her first issue challenging the trial court's evidentiary rulings, we need not reach her factual sufficiency challenge.

admitting testimony from Margaret and her witnesses that Billy was angry at Ava when he executed the 2016 Will because of the alleged taking of his money. She argues the evidence was irrelevant to the issues and prejudicial. She separately argues the trial court erred by excluding Ava's "impeachment evidence related to that issue" undercutting her ability to respond to allegations of her alleged theft of Billy's money resulting in harm.

Because Ava failed to preserve her issues with respect to the trial court's ruling on the admissibility of the challenged evidence, we overrule that portion of Ava's first issue. We conclude, however, that the trial court erred by excluding evidence in response to the admitted evidence concerning Billy's anger and the purported reasons for his anger, and that the error resulted in harm.

## A. Standard of Review

A trial court's decision to exclude evidence rests within the sound discretion of the trial court. We review a trial court's ruling excluding evidence under the same standard of review that governs the admission of evidence. *ESP Res., Inc. v. BWC Mgmt., Inc.*, No. 01-15-00680-CV, 2016 WL 828285, at *5 (Tex. App.—Houston [1st Dist.] Mar. 3, 2016, no pet.) (mem. op.) (citing *Scottsdale Ins. Co. v. Nat'l Emergency Servs., Inc.*, 175 S.W.3d 284, 297 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995) ("The admission and exclusion of evidence is committed to the trial

court's sound discretion."). Even if the trial court abuses its discretion, we will only reverse for an erroneous evidentiary ruling "if the error probably caused the rendition of an improper judgment." *Conlee v. ASI Lloyds*, No. 01-23-00159-CV, 2024 WL 3503067, at *2 (Tex. App.—Houston [1st Dist.] July 23, 2024, no pet.) (mem. op.); (citing TEX. R. APP. P. 44.1); *see also Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998) (stating appellate court must uphold trial court's evidentiary ruling "if there is any legitimate basis for the ruling" and will not reverse erroneous evidentiary ruling unless error probably caused rendition of improper judgment).

Whether an error probably caused the rendition of an improper judgment "necessarily is a judgment call entrusted to the sound discretion and good senses of the reviewing court." *McCraw v. Maris*, 828 S.W.2d 756, 759 (Tex. 1992). "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

## B.     Motion in Limine and Opening Arguments

Before trial began, Ava filed a third amended motion in limine requesting that the court "instruct Margaret and all counsel not to mention, refer to, interrogate about or attempt to convey to the jury in any manner" certain topics

listed in the motion without "first obtaining a ruling from the Court outside the presence and hearing of the jury." Relevant to this appeal, the trial court granted the motion in limine precluding Margaret from (1) "[m]aking or eliciting statements that either party[16] stole property from Billy," (2) "[m]aking or eliciting statements concerning the changing of any beneficiary or title designations on back accounts," and (3) "[e]liciting testimony from a witness which seeks statements, verbal or non-verbal, allegedly made by Billy Washington."

Margaret's counsel argued that Ava's "taking all of [Billy's] money" was "a very important factor in th[e] case." Margaret's counsel argued that he did not want to be barred from

> being able to show the jury [that during the summer of 2016], before [Billy] died, [Ava] went to the bank and changed the beneficiary on one of the accounts herself . . . . She did it using the power of attorney that she was supposed to use for something else and . . . there is a building-up of Ava of things she's done that are highly relevant to why she's not in the Will. And we have a detective coming in here who investigated all this and can talk about what she's done including taking over $300,000 of [Billy's] money and that Mr. Washington was extremely upset, crying-upset, that she would do that.

The trial court held that the issue "concerning behavior of the beneficiary some four months before [was not] relevant to the issue of undue influence or lack of capacity." The trial court judge told the parties he did not want anyone "talking

---

[16] Ava's third amended motion in limine sought to preclude Margaret from making or eliciting any statements that Ava had stolen property from Billy, but the trial court changed it to preclude mention of "either party" having stolen from him.

33

about []either party stealing property from Billy." Margaret's counsel responded, "Your Honor, that is the crux of the motivation of our case. That's a big deal." The trial court disagreed, stating that the crux of the case was "to demonstrate that the decedent ha[d] testamentary capacity," and that the evidence Margaret wanted to elicit was "highly prejudicial toward the conclusion of that, and we're not going to talk about 'stealing.'"

During opening arguments, Ava's counsel told the jury that Billy was hospitalized for about one month in the summer of 2016, and that during that time, he tried to get his affairs in order. She told the jury that Billy called an attorney to ask him to draft a durable power of attorney, and the lawyer brought the power of attorney to the hospital for Billy to sign. Ava's counsel also told the jury that Billy forgot he made a will in 2012, and that the reason he made the 2016 Will was "because Margaret told him he needed a Will."

Outside the presence of the jury, Margaret's counsel argued that these statements had opened the door for Margaret to discuss what Ava did "with the power of attorney and how that impacted [Billy], what his feeling were about that because all of those things led up to why he wanted to have a new [w]ill prepared." He told the court that Ava had withdrawn Billy's money from his bank account with the power of attorney and he needed to show the jury that Billy was mad at Ava "because she took his money out of the bank, and they had to get the police to

34

get the money back under a threat of a felony conviction." He said the picture leading up to this was "critical."

The trial court judge held that he would not "allow testimony to get in . . . about someone stealing money." He ruled the parties could discuss that there was a power of attorney and that Billy had revoked it but "we're going to leave it at that." Margaret's counsel argued that the fact Billy was "very angry at [Ava] for her actions and her use of the power of attorney" was "very important as far as why he signed the will." He continued, "That's pretty much our case. That's our case— why [Billy] did that because [Ava] stole his money. He turned her into the police. He got it back. And then he changed his will. It seems like we have to tell [the jury] why his happened, why that 2012 will was not what [Billy] wanted anymore." The trial court judge reiterated his prior ruling stating, "We're not going to get into that." The trial court judge stated that he would allow witnesses to testify on voir dire "about what they heard Billy say" and the court would then determine whether to admit the testimony.

## C.    Challenge to Admission of Evidence

Ava argues the trial court erred, because despite its prior rulings, it allowed Margaret to introduce testimony from witnesses that Billy had some "anger" towards Margaret that was "understandable," that Billy had been "frustrated" with Ava because of the "taking of our money from the bank," and that Billy had "lost

35

trust" in Ava. She argued the trial court also erred by giving Margaret broad leeway to admit testimony from Detective Webb "concerning what Mr. Washington said to him." She argues her objection to this testimony should have been sustained on three grounds: relevance, unfair prejudice, and hearsay.

As we conclude below, Ava did not preserve these issues for appellate review.

### Margaret's Challenged Testimony

Margaret testified that Billy was "frustrated" with Ava because of "the taking of our money from the bank." When Margaret made the referenced statement, Ava objected, stating, "it's the motion in limine." A motion in limine is not a proper objection and does not preserve error for appellate review. *See In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 161 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) ("A motion in limine preserves nothing for review.") (citing *In re R.V., Jr.*, 977 S.W.2d 777, 780 (Tex. App.—Fort Worth 1998, no pet.). Relying on *In re D.W.G.K.*, Ava argues that while her motion was titled "motion in limine," the substance of her motion indicated the motion was a motion to exclude, and thus the issue was preserved. 558 S.W.3d 671, 682–83 (Tex. App.—Texarkana 2018, pet. denied). We disagree.

In *In re D.W.G.K.*, the appellate court explained that courts "should look to the substance of a motion rather that the title to determine its nature." *Id.* at 682.

Looking at the substance of the motion in that case, the court concluded that the motion, titled "motion in limine," was not a motion in limine but rather a motion to exclude witnesses not timely disclosed during discovery.[17] *Id.* at 683. The court thus concluded that the appellant had preserved her issue challenging the trial court's denial of her motion to exclude. *Id.*

Looking at the substance of Ava's motion, we cannot conclude that her motion was a motion to exclude. Ava's "motion in limine" requested that the court "instruct Margaret and all counsel not to mention, refer to, interrogate about or attempt to convey to the jury in any manner" certain topics listed in the motion "*without first obtaining a ruling from the Court outside the presence and hearing of the jury*." (Emphasis added). Ava did not request that the court strike Margaret's testimony or that it preclude her from testifying all together. She requested only

---

[17]      In *In re D.W.G.K*—a parental termination case—the mother filed a motion titled "motion in limine" requesting that the Department of Family and Protective Services be precluded from calling any fact or expert witnesses not timely and properly disclosed in discovery and requesting that the witnesses be "excluded." 558 S.W.3d 671, 682–83 (Tex. App.—Texarkana 2018, pet. denied). The trial court denied her request. *Id.* at 682. ("I'm going to deny that . . .[and] your point is preserved by the Court's ruling on this . . . ."). On appeal, the Department argued that mother had not preserved the court's ruling for appellate review because a motion in limine does not preserve error. "Considering (1) the substance of [Mother's] motion, (2) Mother's verbal request that "[the Department] be precluded from calling any witnesses," (3) the Department's information attempting to establish the lack of unfair surprise or prejudice, (4) the manner in which the hearing was conducted, and (5) the trial court's ruling," the appellate court concluded that "Mother's specific request to strike the witnesses was a motion to exclude the Department's witnesses rather than a motion in limine." *Id.* at 683.

that her counsel approach the bench before discussing certain matters.[18] The motion was thus a "motion in limine" which did not preserve Ava's evidentiary challenge for appellate review. *See* TEX. R. APP. P. 33.1(a); *In re Wyatt Field Serv. Co.*, 454 S.W.3d at 161.

Ava also failed to obtain a ruling on any objection to Margaret's challenged testimony. After Margaret made the challenged statements and Ava objected based on her motion in limine, the trial court told Margaret's counsel to "move on and stay away from that topic." "An instruction to 'move along' is not a ruling." *Nguyen v. Zhang*, No. 01-12-01162-CV, 2014 WL 4112927, at *4 (Tex. App.— Houston [1st Dist.] Aug. 21, 2014, no pet.) (mem. op.).[19] Ava thus did not secure a ruling on her objection, and she did not preserve the issue for our review. *See S. C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-20-00039-CV, 2020 WL

---

[18] On the same day she filed her third motion in in limine, Ava separately filed a motion to exclude the testimony of Debra Jarmon and "disclosure of hearsay by Dr. Glass." She did not file a separate motion to exclude Margaret's testimony concerning the matters described in her motion in limine and challenged on appeal.

[19] Ava also did not ask the trial court to instruct the jury to disregard Margaret's testimony about the taking of their money or any testimony about Billy's anger toward Ava. *See In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 161 (Tex. App.— Houston [14th Dist.] 2014, orig. proceeding) ("The complaining party must immediately object and also request the trial court to instruct the jury to disregard the evidence."); *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.6 (Tex. 1989) ("Failure to request the court to instruct the jury to disregard the inadmissible testimony results in waiver of the alleged error where the instruction would have cured the error."); *In re B.W.*, 99 S.W.3d 757, 760 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (same).

3892796, at *12 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) ("The trial court's statement to move on was not a ruling on the Department's counsel's statement, and there was no objection to the trial court's refusal to rule. Therefore, the complaint . . . is not preserved for our review.") (citing TEX. R. APP. P. 33.1(a)(2)).

### *Detective Webb's Testimony*

Ava argues that Detective Webb's testimony was prejudicial and violated Rule of Evidence 403. She argues his testimony carried extra weight because he testified as a uniformed law enforcement officer, who "bless[ed]" Margaret's theory "that Billy had been angry at Ava back in October [2016]." Ava points to five examples of the "inflammatory" nature of Detective Webb's testimony. She challenges Detective Webb's testimony that:

- when he spoke with Billy in the fall of 2016, he worked investigating white collar crimes and "dealt a lot" with Adult Protective Services;

- Billy was "upset" and "sad" when they spoke;

- he "spoke to [Ava] maybe twice" during his investigation;

- he found Billy's reaction to the events of which he complained to be appropriate and understandable, and that what Billy said was accurate; and

- the implication "that the 2016 Will's change of the main beneficiary from Billy's daughter, Ava, to Margaret . . . was made at Detective Webb's suggestion."

Ava argues that Detective Webb's testimony was so prejudicial that it turned the jury's focus away from whether Billy had testamentary capacity in December 2016 to the issue of whether Ava's efforts to enforce the 2012 Will were consistent with alleged financial crimes against Billy. Ava argues the trial court erred by allowing Detective Webb's testimony "to poison the mind of the jury" because the gravamen of his testimony was that Ava had stolen from her dying father.

Ava did not specifically object to Detective Webb's testimony under Rule 403. She also did not object during his testimony. The extent of Ava's exchange with the trial court prior to Detective Webb's testimony was as follows:

| Ava's counsel: | So, I'm just trying to get a sense of what's the limitations of this? I know what the motion in limine is, but I want to make sure I'm not jumping up and objecting all the time, and just to get some clear direction on what he can say and can't say. |
|---|---|
| The Court: | Well, we had a witness that testified that she saw this interaction where he was very upset with Ava Washington and talked to the police officer. I allowed that under an exception. I think this police officer is entitled to provide that type of testimony that Mr. Washington gave under an 803.3 exception concerning what Mr. Washington said to him. |
| Ava's counsel: | So he can testify about what [Billy] said? |
| The Court: | I think so. I think he qualifies under that exception. Make your record, but under an 803.3, he can, somewhat of an excited, emotional state. |

The trial court's ruling indicates the court allowed the testimony under a hearsay

exception. There is no record Ava objected to the testimony under Rule 403. Because a Rule 403 objection was not presented to the trial court, Ava did not preserve that issue for appellate review. *See S. Plains Lamesa R.R., Ltd. v. Heinrich*, 280 S.W.3d 357, 364 (Tex. App.—Amarillo 2008, no pet.) ("[T]he complaint on appeal must comport with the objection at trial. Because the evidence was not objected to on the grounds of Rule 403, the complaint is waived.") (citing *Tex. Dep't of Transp. v. Olson,* 980 S.W.2d 890, 898 (Tex. App.—Fort Worth 1998, no pet.)).

To the extent Ava argues Detective Webb's testimony was inadmissible under Rule 803(3), we disagree. As Ava concedes in her appellate brief, Rule 803(3) allows a witness to testify that a third-party had a particular emotion. Thus, the trial court acted within its discretion in allowing testimony that Billy was angry.[20] *See generally Gonzales v. Patterson*, No. 03-23-00799-CV, 2024 WL 4508177, at *7 (Tex. App.—Austin Oct. 17, 2024, no pet.) (mem. op.) (holding statements in witness' affidavit were admissible under Rule 803(3) "because they address Decedent's then-existing state of mind—his intent and plan for changing his will and the disposition of his property").

Because Ava did not preserve her Rule 403 issue with respect to the admission of testimony from Detective Webb and the trial court did not abuse its

---

[20] Detective Webb did not testify Billy was angry at Ava. Even if his testimony implied as much, he did not explain why Billy was angry with Ava.

discretion in admitting Detective Webb's testimony that Billy was "upset" and "sad" under Rule 803(3), we overrule that portion of Ava's first issue.

## D. Challenge to Exclusion of Evidence

As part of her first issue, Ava also argues that the trial court abused its discretion by precluding her ability to respond to Margaret's and Detective Webb's testimony regarding Billy's alleged anger towards her. She argues the error was harmful because it allowed Margaret to leave an impression with the jury that Ava had stolen money from Billy, that Billy was angry at her, and that as a result, Billy signed the 2016 Will leaving his estate to Margaret.

We agree with Ava that the trial court reversibly erred.

### 1. Abuse of Discretion

Ava argues that the trial court erred by excluding her "impeachment evidence related" to Billy's alleged anger and the taking of his money. She argues that Margaret's and Detective Webb's testimony opened the door for Ava to present evidence that she moved her father's money at her father's instruction. According to Ava, Billy had given her a power of attorney and "'told her to go and move money' but 'he'd forgotten' that instruction." Yet, by allowing Margaret and her witnesses to testify about Billy's alleged anger toward Ava and the alleged taking of his money, and precluding Ava's ability to respond, the jury was left with the impression that Ava had stolen money from Billy, that Billy was angry at her,

42

and that as a result, Billy signed the 2016 Will leaving his estate to Margaret. That is, that Billy had testamentary capacity when he signed the 2016 Will because he was justified in changing his will.[21]

Ava complains about Margaret's testimony regarding Billy's anger and the alleged "taking of his money." She also argues the trial court erred by precluding her ability to question Detective Webb about his discussion with Billy and the alleged commission of a crime.

During cross-examination, Ava's counsel asked Detective Webb whether anyone had been "charged with anything" based on his investigation, and he responded, "No one was charged." But Detective Webb also stated that a crime had been committed. On re-direct, Margaret's counsel asked Detective Webb:

Q:  Is everybody that is upset about something always willing to file charges?

A:  No.

Q:  Just in your experience, what would be exceptions?

A:  Exceptions would be family members.

Q:  What?

A:  Family members.

---

[21]  The only reference to the power of attorney during trial was in the opening statement, when Ava said Billy got a power of attorney after receiving his terminal cancer diagnosis. "He didn't ask that lawyer to make a [w]ill. He already had a [w]ill. He had a [w]ill from 2012."

Q:     Before you do that—I withdraw the question.

Based on counsel's statement that he was withdrawing the question, the trial court held that a redirect had not occurred and the court did not allow Ava's counsel to re-cross examine Detective Webb. The trial court judge apparently did not hear Detective Webb's answer during the re-direct, stating: "She asked the question, she withdrew it. I didn't hear an answer from this gentleman . . . I do not believe a redirect occurred."

In response, Ava made the following objection:

Your Honor, I would object to not allowing me to continue to ask questions. I think there was a redirect. The redirect is on the record. What she asked was—"Is it true that just because a crime was committed that there is no charge and the individual reported?" And he said, "That's correct. There's exceptions in family." And I asked to be able to ask questions.

The question I was going to ask is—is there other reasons, too?

. . .

I was going to ask a question. So, if somebody had a Power of Attorney, would they have been able to do the kind of work and move the money that she did and what was complained of? And if she, in fact, had a Power of Attorney, and the Power of Attorney was valid at the time?

So, that was the evidence that I was going to procure, but the judge ordered me not to continue, and I would object to that.

The trial court overruled Ava's objection.

Ava argues that once the trial court admitted testimony from Margaret and

later from Detective Webb about Billy's alleged anger and the alleged commission of a crime, she "needed to fight back regarding what Margaret called 'pretty much' the 'crux' of her case."[22] She argues that the excluded evidence was admissible because even otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered "opens the door."

Margaret responds that there can be no doubt that Billy's motivation for executing the 2016 Will and his anger towards Ava was evidence the jury needed to hear. She argues it would have been "reversible error for this evidence to have been withheld from the jury." She argues that evidence "of a strained or broken relationship between a testator and his child would have some tendency to show that the testator's decision to disinherit the child was the choice of a person with mental capacity, rather than the ramblings of an incompetent."

This argument, however, supports rather than undercuts Ava's argument. If the challenged testimony had a "tendency" to establish that Billy's choice to disinherit Ava was the "choice of a person with mental capacity," it was an abuse of discretion for the court to preclude Ava from offering impeachment testimony in response to Detective Webb's and Margaret's challenged testimony. Margaret argues that Ava's explanations for moving Billy's money were not relevant and it

---

[22]    Margaret's counsel argued during the pretrial hearing that Margaret's case turned on Ava's having "stole[n] his money. [Billy] turned her into the police. He got it back. And then he changed his Will. It seems like we have to tell why this happened, why that 2012 Will was not what he wanted anymore."

was proper for the trial court to keep the "trial focused on the execution of the 2016 Will." We agree that the key issue for the jury to determine was whether Billy had testamentary capacity to execute the 2016 Will, but once evidence of the alleged taking of Billy's money and his corresponding anger towards Ava was admitted—evidence Margaret argues went to mental capacity—it was an abuse of discretion for the court to preclude Ava from introducing evidence concerning that matter.

"Evidence of a testator's state of mind at other times can be used to prove his state of mind on the day the will was executed if the evidence demonstrates that a condition affecting his testamentary capacity was persistent and likely present at the time the will was executed." *In re Estate of Hemsley*, 460 S.W.3d at 634. The jury heard from Margaret and her witnesses that money was taken, that Billy was angry at Ava, that Billy was very hurt and upset about what happened, that he talked to a detective about the alleged taking of the money, and that a crime had been committed. During oral argument, Ava argued that evidence Billy had given Ava direction to move his money in October 2016, together with evidence Billy immediately forgot such directive, contacted a detective about it in October 2016, and remained angry and upset about it through December 2016, is evidence that Billy was not—starting in October 2016 and through December 2016—of sound mind to execute a will.

46

The evidence Ava attempted to introduce, as reflected in the offers of proof, was therefore not merely evidence to justify Ava's actions, as Margaret asserts, but also evidence that went to Billy's testamentary capacity. We conclude that once Margaret and her witnesses were permitted to introduce evidence about Billy's anger and the alleged taking of his money, it was an abuse of discretion for the court to exclude Ava's attempt to introduce evidence on that matter. *See Zarsky v. White*, 704 S.W.3d 211, 224 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) ("[A] trial court abuses its discretion if, in a suit to cancel a deed, it categorically excludes admissible evidence that the grantor lacked mental capacity on the day the deed was executed."); *Offord v. West Houston Trees, L.L.P.*, No. 01-08-01027-CV, 2010 WL 457447, at *7 (Tex. App.—Houston [1st Dist.] 2010, Feb. 11, 2010, pet. denied) (mem. op.) (holding that "evidence must relate to the condition at it existed at the particular time at issue, but evidence of the state of the person's mind at other, and especially prior, times may be relevant" to mental capacity); *Miguez v. Miguez*, 221 S.W.2d 293, 296 (Tex. App.—Beaumont 1949, no writ) (holding trial court abused discretion by excluding testimony from witnesses about acts by "deceased as they observed them," and that while "in any proceeding involving a question of mental condition, the proof must be directed to the condition as it existed at a particular time, such condition as such time may be proved by evidence of the state of the person's mind at other and especially prior times").

47

## 2. Preservation

Margaret argues that Ava failed to preserve her issue for appeal because she did not make an offer of proof. We disagree.

With respect to Detective Webb, Ava summarized for the trial court what she wanted to ask him on re-cross examination. "An offer of proof may be in the form of concise statement by counsel or in question-and-answer form." *See Bowman v. Patel*, No. 01-10-00811-CV, 2012 WL 524428, at *3 (Tex. App.—Houston [1st Dist.] Feb. 16, 2012, no pet.) (mem. op.) (citing *Chance v. Chance*, 911 S.W.2d 40, 51–52 (Tex. App.—Beaumont 1995, writ denied)). "It is not required that the offer of proof show what specific facts the examination would reveal, but the appellant must clearly inform the trial court of the subject matter about which it wants to examine the witness." *Bowman*, 2012 WL 524428, at *3 (citing *Fletcher v. Minn. Mining & Mfg. Co.*, 57 S.W.3d 602, 610–11 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)). Ava adequately informed the trial court of the subject matter about which she wanted to question Detective Webb. She thus preserved the issue as to his testimony.

Ava also made an offer of proof for Margaret's testimony. During Margaret's direct testimony, Margaret made an offer of proof regarding Ava's transfer of money from Billy's bank accounts into an account with Ava's name, which Margaret testified upset Billy. Margaret testified that Ava took at least

$200,000 from a Bank of America account and approximately $65,000 from a Chase Bank account. Margaret also testified during the offer of proof that Billy made the 2016 Will because "when he did his [2016] Will, he told me he didn't have a [w]ill, so. And then he was angry with Ava, too." She testified that when Billy found out the money had been taken from his account, he "[c]ouldn't believe it. He was heartbroken." As a result, he contacted the police and met Detective Webb. Margaret testified that after Ava spoke with Detective Webb, she returned some of the money that had been transferred out of Billy's account.

Ava's counsel cross-examined Margaret during the offer of proof. He explained to the court what he was attempting to establish:

> Judge, we had this conversation in pretrial, and I told you the facts of what happened that [Margaret] contacted . . . the police and said there is a missing person, and she didn't know where Billy was; Billy was lost; he came back home; followed a taxi cab driver; drove off; and as he was driving off, [Billy] said "Ava, get my money." He screams it out of the window. That's where this is heading.

> Ava went and got the money with the Power of Attorney, and [Billy] forgot that he told her to get the money. That's what this is all about. That's what I wanted to get into, Judge. That's what happened . . . .

The trial court allowed Ava to question Margaret about this during the offer of proof. She testified that Billy needed a taxi to "direct him home" because "he had got lost," "he couldn't find his way back where he was," and she called the police and reported Billy missing because "he was gone." Margaret testified that after Billy arrived at home, Billy drove off with his granddaughter. Ava's counsel asked

Margaret, "[a]s Billy was driving off . . . what did he yell out the window?" Margaret objected to Ava's question as hearsay and under Rule of Evidence 601(b), also known as the Dead Man's Rule, which requires a corroborating statement for a decedent's oral statement to be admissible.[23] The trial court sustained the objection, overruling Ava's request to question Billy's granddaughter about the statement in order to corroborate it as required under Rule 601(b)(3)(A). Ava told the judge that she wanted to make her own offer of proof with respect to Margaret's testimony, to ask Margaret "if there's a Power of Attorney, if [Billy] knew he had a Power of Attorney, if he forgot he had a Power of Attorney and whether or not he ever directed Ava to move the money." The court denied Ava's request for an offer of proof, stating that he "previously ruled on Power of Attorney, so you're not going to do that."

In light of the above, we conclude that Ava preserved her challenge to the trial court's exclusion of evidence as presented in her first issue.

---

[23] Texas Rule of Evidence 601(b), also known as the Dead Man's Rule, "prohibits a party in a suit by or against a decedent's heirs or representatives from testifying 'about an oral statement' made by the decedent unless (A) 'the party's testimony about the statement is corroborated' or (B) 'the opposing party calls the party to testify at the trial about the statement.'" *Bertucci v. Watkins*, 709 S.W.3d 534, 549 (Tex. 2025) (quoting TEX. R. EVID. 601(b)(2), (3)). The rule is intended "to prevent one party from having an unfair advantage over another whose lips had been sealed by death by excluding testimony against a decedent which he might deny or contradict if he were living." *Id.* (quoting *Lewis v. Foster*, 621 S.W.2d 400, 404 (Tex. 1981)).

### 3. Harm

Even when a trial court abuses its discretion by excluding evidence, we cannot reverse the trial court's judgment on this basis unless the exclusion of the evidence probably resulted in an improper judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668–69 (Tex. 2018). Application of the harm standard is "less a precise measurement and more a matter of judgment." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 551 (Tex. 2018). "[E]stablishing a bright-line rule" to determine when the exclusion of evidence is harmful "is impossible." *Gunn*, 554 S.W.3d at 669 (citing *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 145 (Tex. 2016)). In our review, we consider the entire record "to assess the importance of the excluded evidence, and exclusion is likely harmful if the evidence is crucial to a key issue." *Diamond Offshore Servs.*, 542 S.W.3d at 551. Improperly excluded evidence that is "crucial to a key issue" is likely harmful "unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018) (citing *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009)).

### (a) Was the excluded evidence crucial to a key issue?

Margaret argues that any error in excluding testimony about the power of attorney or Billy's directive to Ava to transfer money was harmless because while

"[e]vidence of Billy's feelings toward Ava were admissible and relevant, and they explain his motivation for executing the will . . . that evidence was not necessary." She avers that the admission of evidence about Billy's motivation was "almost insignificant" compared to the "direct evidence of capacity and lack of undue influence."

Yet Margaret told the trial court before and during trial that evidence of Ava's action in taking Billy's money should be admitted as it was "pretty much [her] case," "the crux of the motivation" of her case, and "a big deal." Indeed, in her closing argument, Margaret spent significant time alluding to the alleged crime. Her counsel argued during closing:[24]

- Detective Webb told us that he talked to Billy and Billy talked to him, and Billy wanted him to come there so he could talk to him in person. He said he was angry, he said he was justifiably angry, he said a crime had been committed. What more do you need?"

- "There is evidence from Detective Webb that he talked to Ava. There is evidence from Detective Webb that a crime was committed, and there is evidence that Billy Washington was furious, and then he changed his will."

---

[24] We are cognizant that arguments of counsel are not evidence. *See Hines v. Maple Hous. of Beaumont*, No. 09-17-00381-CV, 2019 WL 2455271, at *4 (Tex. App.—Beaumont June 13, 2019, no pet.) (mem. op.) ("Arguments of counsel do not constitute evidence.") (citation omitted). We refer to the closing arguments only to reflect Margaret's apparent belief that the issue was key to her case.

- Ava "knew exactly why [Billy] cut her out. And when somebody leaves a dollar, that's a statement. It's not just a dollar, it's a statement; and he was a man to make statements."

- "It's no mystery why he left Ava a dollar. No mystery."

- "So, there's so much to say, but Mr. Washington was motivated, had a reason, an understandable reason, for why he cut his daughter out of the Will. And he did."

The jury was charged with deciding whether, on the day he signed the 2016 Will, Billy had testamentary capacity and whether the will was the result of undue influence. Margaret argues in her brief that this testimony was not relevant to the key legal issues the jury had to decide. Ava argues she was entitled to present testimony regarding her power of attorney and Billy's directive that she transfer funds to another account because it indicated Billy had forgotten his own directive to her thus demonstrating his mental infirmity.

Given the importance Margaret's counsel placed on the challenged evidence and the focus her counsel placed on the evidence during closing,[25] we cannot conclude that the evidence was irrelevant or insignificant to a key issue. *See Mittelsted*, 661 S.W.3d at 900 ("[E]vidence of the testator's state of mind at other

---

[25] We note that a finding of undue influence did not depend on a finding regarding the reason for Billy's desire to sign the 2016 Will. To prove undue influence, Ava would have had to prove (1) an influence on Billy existed and exerted, (2) the influence undermined or overpowered Billy's mind when he signed the 2016 Will, and (3) he would not have signed the 2016 Will if not for the influence. *See Altice v. Hernandez*, 668 S.W.3d 399, 413 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963)).

times can be used to prove his state of mind on the day the will was executed provided the evidence demonstrates a condition affecting his testamentary capacity was persistent and likely present at the time the will was executed."); *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983) (holding that even in absence of direct evidence that decedent lacked testamentary capacity when he signed will, "[e]vidence of incompetency at other times can be used to establish incompetency on the day the will was executed if it 'demonstrates that the condition persists and has some probability of being the same condition which obtained at the time of the will's making.'") (quoting *Lee v. Lee*, 424 S.W.2d 609 (Tex. 1968)) (internal quotation marks omitted).

We conclude the excluded evidence was crucial to the issue of mental capacity.

**(b)  Was the excluded evidence cumulative or the rest of the evidence so one-sided that the error likely made no difference in the judgment?**

The second consideration also supports a determination that the trial court's error was harmful. The jury heard evidence that suggested Ava committed a crime by stealing from her father, but Ava was not afforded the opportunity to present corresponding evidence on the topic:

- Margaret testified that Billy was "frustrated" because of Ava's "taking of our money from the bank."

- Detective Webb testified that when he spoke with Billy, the detective was investigating white collar crimes and "dealt a lot" with Adult Protective Services;

- Detective Webb testified he found Billy's reaction to the events of which he complained was appropriate, understandable, and that what Billy told him was accurate.

- Detective Webb testified that a crime was committed.

- Detective Webb told Billy he could do whatever he wanted with his estate and that to do that, he should contact an attorney.

The excluded testimony was not cumulative nor was the rest of the evidence "so one-sided that the error likely made no difference in the judgment." *JBS Carriers, Inc.*, 564 S.W.3d at 836.

We conclude that the excluded evidence was crucial to a key issue and that the evidence was not cumulative or the rest of the evidence so one-sided that the error likely made no difference in the judgment. The trial court's error thus resulted in harm.

We sustain this portion of Ava's first issue.[26]

## Conclusion

We hold the trial court abused its discretion by excluding testimony and that the error resulted in harm. We reverse and remand for further proceedings consistent with this opinion.

---

[26] Because of our disposition, it is not necessary to address Ava's factual sufficiency challenge. *See* TEX. R. APP. P. 47.1.

55

                                        Veronica Rivas-Molloy
                                        Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.